**OKLAHOMA WATER RESOURCES BOARD and Mobil Oil Corporation, a New York Corporation, Appellants,**

v.

**TEXAS COUNTY IRRIGATION AND WATER RESOURCES ASSOCIATION, INC., a non-profit Oklahoma Corporation, by its Board of Directors, Appellee.**

No. 56355.

Supreme Court of Oklahoma.

Dec. 26, 1984.

Rehearings Denied Feb. 12, 1985.

R. Thomas Lay, Gen. Counsel, Oklahoma Water Resources Bd., Oklahoma City, for appellant Water Resources Bd.

Sid M. Groom, Jr., Ames, Daugherty, Black, Ashabranner, Rogers & Fowler, Edmond, John E. Robertson, Denver, Colo., for appellant Mobil Oil Corp.

Andrew T. Dalton, Jr., Tulsa, for appellee.

Joseph F. Rarick, Norman, Steven E. Moore, Oklahoma City, for amicus curiae Oklahoma Gas and Elec. Co.

Diane Pedicord, Oklahoma City, for amicus curiae Oklahoma Municipal League.

ALMA WILSON, Justice.

This appeal involves an administrative order of the Oklahoma Water Resources Board [Board]. The Board approved the application of Mobil Oil Corporation [Mobil] to withdraw fresh ground water for secondary and tertiary waterflood operations in Texas County, Oklahoma. The District Court of Texas County partially reversed the Board's order. This appeal resulted.

Mobil filed its application with the Board on February 13, 1979. Mobil requested a temporary permit to withdraw 6375.03 acre-feet of fresh ground water annually during the projected 20-year life of its oil and gas recovery project. The leased water rights covered 3,442 acres overlying the Ogallala Aquifer in Texas County, Oklahoma. The proposed place of use covered a total surface area of 24,540 acres in Texas County. Mobil estimated that it would withdraw annually an average of .744 acre-feet of fresh ground water per acre of leased ground water rights; maximum use would occur in 1993 when 1.852 acre-feet of fresh ground water would be withdrawn; minimum use would occur in 1998 when .209 acre-feet of fresh ground water would be withdrawn.

An administrative hearing was held on August 16, 1979. The Texas County Irrigation and Water Resources Association [Association] and three adjacent landowners protested Mobil's application. The Board ruled that Mobil had complied with all applicable statutory and administrative prerequisites and issued a temporary permit for a term of 20 years. The temporary permit was subject to automatic annual revalidation by the Board.

The Association sought judicial review of the Board's administrative ruling in the District Court of Texas County. The Association urged, *inter alia*, that the use of fresh ground water for secondary and tertiary oil recovery constitutes waste because the water is not continued in the natural cycle, but is polluted and lost permanently. The District Court did not view the use of fresh ground water by Mobil in secondary or tertiary oil recovery to be waste under the law. The District Court also conceded that Mobil's proposed use is a beneficial one. The District Court, however, further determined that Mobil's proposed use of fresh ground water off the lands from

which it is produced constitutes an unreasonable use of water from a critical ground water source. Thus, the District Court affirmed the Board's issuance of the permit, but reversed the Board's decision insofar as it permitted Mobil to transport fresh ground water off the premises from which it is withdrawn.

The Board and Mobil prosecuted this appeal from the order of the District Court. These appellants maintain that under the facts of this case the District Court erred as a matter of law in not affirming, in total, the Board's administrative order. The Oklahoma Municipal League [League] and Oklahoma Gas and Electric Company [OG & E] petitioned this Court for leave to file briefs amicus curiae in this appeal. The League and OG & E take no position on the question of whether or not the Board, under the facts of this particular case, erred in issuing a permit to Mobil. These amicus curiae present the following substantive issues to this Court for resolution:

(1) Is a concept of conflicting beneficial uses in a critical ground water area recognized under current Oklahoma ground water law?

(2) May percolating water be used off the lands from which it is produced under current Oklahoma ground water law?

I

In 1972, our Legislature revised Oklahoma's statutory system for regulating the use of ground water. *See* Laws 1972 c. 248, § 1, *et seq.*, now 82 O.S.1981, § 1020.1 *et seq.* Prior to the 1972 enactment, the 1949 Ground Water Law, as amended at 82 O.S.1971, § 1001–1019, was in effect. The 1949 Act envisioned a system of *conservation* in which only the safe annual yield of a basin as measured by its average annual recharge would be permitted to be withdrawn. Accordingly, the 1949 Act recognized the concept of a "critical ground water area".[1] Under the 1972 revisions, however, the Legislature adopted a policy of *utilization* of water as opposed to the prior use conservation policy. The declaration of policy of the 1972 Ground Water Act, 82 O.S.1981, § 1020.2, expressly provides:

*"It is hereby declared to be the public policy of this state,* in the interest of the agricultural stability, domestic, municipal, industrial, and other beneficial uses, general economy, health and welfare of the state and its citizens, *to utilize the ground water resources of the state,* and for that purpose to provide reasonable regulations for the allocation for reasonable use based on hydrologic surveys of fresh ground water basins to determine a restriction on the production based upon the acres overlying the ground water basin or subbasin. The provisions of this act shall not apply to the taking, using or disposal of salt water associated with the exploration, production or recovery of oil and gas or the taking, using or disposal of water trapped in producing mines."[2] *(Emphasis added)*

As reflected in the above declaration of policy, *use regulation and management* is contemplated as the means of restricting production of water. The 1972 Act thus contains no provisions for the designation of a "critical ground water area". Rather, apportionment for reasonable use is the standard. Pursuant to this standard, beyond prior existing water rights, the right to withdraw ground water for non-domestic use is apportioned based

---

1. The 1949 Act defined "critical ground water area" as any ground water basin or subdivision thereof "not having sufficient ground water to provide a reasonably safe supply for domestic, municipal, industrial, irrigational, recreational, and other beneficial uses in the basin at the then current rates of withdrawal." 82 O.S.1961, § 1002.

2. The wisdom, or lack thereof, of adopting a policy of utilization over conservation is not within the province of this Court to decide. It is solely the prerogative of the Legislature to fashion ground water policy and the courts may not substitute their judgment for that of the Legislature. *See, Okla.Const.* Art. 4 § 1; *Also, see, Utility Supply Co. Inc. v. City of Broken Arrow,* 539 P.2d 740 (Okl.1975).

on the maximum annual yield of the basin. The maximum annual yield is measured on a minimum basin life of 20 years, and the amount of land overlying the basin or sub-basin.[3] Consequently, whereas under the 1949 Act a permit for the extraction of water could not be issued if the Water Resources Board found that such use would result in depletion above the average annual rate of recharge; under the 1972 Act a regular permit to use water allocates to the applicant for beneficial use a proportionate share of the maximum annual yield of the basin. Since the proportionate share of the maximum annual yield of the basin equals the percentage of land owned or leased by the applicant (as compared to the total acreage of the basin), the use of non-use by one landowner neither decreases nor increases the proportionate share of another. Moreover, in addition to not recognizing "critical ground water areas", the 1972 Act neither recognizes nor mentions *preferences* between beneficial uses. The concept of conflicting beneficial uses in a critical ground water area has no application in the current ground water law.

## II

The policy and statutory scheme for regulating the use of ground water set forth above do not embrace a prohibition against the use of fresh ground water off the premises from which it is withdrawn. Indeed, the 1972 Act indicates an intention by the Legislature to allow the use of duly allocated ground water at a distance from the land from which the water is produced so long as current use regulations, including waste prohibition, are satisfied. This intention is evidenced by Section 1020.8 which provides that an application contain among other things, "the place*s* of taking and use" *(emphasis added)*, as well as

Section 1020.15 which prohibits waste by "[t]ransporting fresh ground water from a well to the place of use in such a manner that there is an excessive loss in transit."

■ Significantly, the only substantive limitation on use *per se*, whether on or off the place of origin, is that it be a *reasonable use*. In this context, Section 1020.2, discussed *supra*, provides:

"It is hereby declared to be the public policy of this state, ... to *utilize* the ground water resources of the state, and for that purpose to provide reasonable regulations for the *allocation for reasonable use* based on hydrologic surveys of fresh ground water basins to determine a *restriction on the production*, based on the acres overlying the ground water basin or subbasin.... *(Emphasis added).*

Regulations for the allocation of ground water for reasonable use are codified at 82 O.S.1981, § 1020.9, which provides:

"At the hearing, the *Board shall determine* from the evidence presented by the parties interested, from the hydrologic surveys and from other relevant data available to the Board and applicant, *whether the lands owned or leased* by the applicant *overlie the fresh groundwater basin* or subbasin and *whether the use to which the applicant intends to put the water is a beneficial use.* If so, *and* if the Board finds *that waste will not occur*, the Board shall approve the application by issuing a regular permit...." *(Emphasis added).*

We conclude that movement of fresh ground water off the producing premises is not precluded by the limitation of reasonable use so long as use regulations now codified in the 1972 Oklahoma Ground Water Law, 82 O.S.1981, § 1020.1, *et seq.,*

---

**3.** Oklahoma Groundwater Law, 82 O.S.1981, § 1020.5 provides: "After making the hydrologic survey, the Board shall make a determination of the maximum annual yield of fresh water to be produced from each groundwater basin or subbasin. Such determination must be based upon the following: 1. The total land area overlying the basin or subbasin; 2. The amount of water in storage in the basin or subbasin; 3. The rate of natural recharge to the basin or subbasin and total discharge from the basin or subbasin; 4. Transmissibility of the basin or subbasin; and 5. The possibility of pollution of the basin or subbasin from natural sources. The maximum annual yield of each fresh groundwater basin or subbasin shall be based upon a minimum basin or subbasin life of twenty (20) years from the effective date of this act."

have been properly adjudicated and the evidence establishes that the applicant is in compliance therewith.

### III

In their petitions-in-error, Mobil and the Board include the following propositions as error under the facts of the present case:

"The District Court was in error when it determined that Mobil's off the premises use under authority of permit granted by Oklahoma Water Resources Board *was an unreasonable use* and the Oklahoma Water Resources Board exceeded its authority in approving and granting Mobil its permit."

"The District Court was in error when it failed to affirm the Oklahoma Water Resources Board's Order in its entirety as being in *conformity with the law and regulations.*"

"That the trial court's finding, conclusion and determination that the issue before the Court was whether appellant applied *"the law of reasonable use"* as relates to a ground water use from a "critical ground water area" *and as relates to the permit granted* by appellant to defendant Mobil, *was contrary to relevant law and applicable Oklahoma Ground Water Law.*"

"That the *trial court's finding,* conclusion and determination that defendant Mobil's [off the premises] *use under authority of permit* granted by appellant *was an unreasonable use* and that appellant exceeded its authority in approving and granting defendant its permit, was *error and contrary to relevant and applicable Oklahoma Ground Water Law.*"

"That the trial court erred under applicable law and under the record of the proceedings before it *in not affirming, in total,* appellant's administrative *Order* and ruling appealed in the action below *and in not denying, in total, the relief prayed for by appellee* (plaintiffs below) in the proceedings below." [Emphasis added].

▮ A determination of these propositions of error necessarily requires a review of the record of the administrative hearing conducted by the Board.[4] It is urged that the trial court erred under relevant and applicable Oklahoma Ground Water Law in finding Mobil's off the premises use unreasonable in this case. Whether Mobil has complied with the use regulations of the current ground water law, such that its proposed movement of water off the producing premises is not precluded by the limitation of reasonable use is dependent upon the evidence in the record.

▮ Under the current ground water law of this state, prior to the approval of Mobil's application for allocation of fresh ground water, it was incumbent upon Mobil to present evidence that the intended use was reasonable by establishing: (1) it owns or leases lands overlying the Ogallala formation; (2) that its intended use is a beneficial use; and, (3) that waste will not occur. *See,* 82 O.S.1981, § 1020.9, *supra.*

▮ Mobil objects to our consideration of the third element, above, on the ground that the question of waste was not presented by cross-appeal. Obviously, the issue of the use and control of fresh water is one publici juris, and of immediate local, national, and international concern.[5] This Court may, in its discretion consider a public-law issue upon a theory not presented to the trial court, unfettered by the form of redress sought.[6] However, in the present

---

**4.** Although the Association did not cross-appeal, the issues in this administrative proceeding are formed by the evidence. In order to determine whether the order of the Board has a substantial basis in evidence, an examination of the record must be made. Otherwise, this Court is without a basis to determine the weight of the evidence. *See,* 75 O.S.1981, § 322, for administrative review standards. *Also, see* generally, *Muskogee*

*Gas & Electric Co. v. State,* 81 Okl. 176, 186 P. 730 (1920).

**5.** Publici juris was recognized and utilized by this Court in *State ex. rel Poulos v. State Board of Equilization,* 552 P.2d 1134, 1137 (Okl.1975).

**6.** *McCracken v. City of Lawton,* 648 P.2d 18, 21 (Okl.1982), and cases cited therein.

case, we note that a finding that waste will not occur is an integral part of the "relevant and applicable Oklahoma Ground Water Law" urged by Mobil on appeal to challenge the trial court's refusal to affirm the administrative order in its entirety and deny any relief to the Association. Hence, it is unnecessary to exercise our discretion (enlarge the issues) in this matter as Mobil has effectively petitioned this Court to apply the current ground water law to the proceedings in the record to determine the correctness of the administrative order.

The record of the administrative hearing shows that Mobil held valid ground water leases covering 3,442 acres overlying the Ogallala fresh water basin. Likewise, Mobil's intended use of the fresh water in secondary or tertiary oil recovery falls within the enumerated beneficial uses provided by the declaration of policy: "....agricultural, domestic, municipal, industrial and other beneficial uses...." 82 O.S. 1981, § 1020.2; and, Water Resources Board Rule 125.1, which states:

"Beneficial use of the use of such quantity of stream or ground water when reasonable intelligence and reasonable diligence are exercised in its application for a lawful purpose and is economically necessary for that purpose. Beneficial uses include but are not limited to municipal, industrial, agricultural, irrigation, recreation, fish and wildlife, etc."

The Board's order, however, does not contain essential findings of fact to support a finding that waste will not occur in the process of tertiary oil recovery.[7] The concepts of beneficial and non-wasteful use are not identical as urged by the Board. The appropriate definition of waste is found in the Board's own Rules and Regulations:[8]

WASTE OR WASTE OF WATER means any act permitting or causing the *pollution of fresh water* or the use of

such water in an inefficient manner or any manner that is not beneficial and is further defined in 82 O.S.Supp.1972, § 1020.15. *(Emphasis ours)*.

Waste by pollution, as above enumerated, is expressly defined by the pollution laws of this state, 82 O.S.1981, §§ 926.1, 932.-1(d), which also apply to underground water. Section 926.1 defines pollutions as follows:

Pollution means contamination or other alteration of the physical, chemical or biological properties of any natural waters of the State or such discharge of any liquid, gaseous, or solid substance into any waters of the State as will or is likely to create a nuisance or render such waters harmful or detrimental or injurious to public health, safety, or welfare, or to domestic, commercial industrial, agricultural, recreational, or other legitimate beneficial uses, or to livestock, wild animals, birds, fish, or other aquatic life.

■ While this Court has held that use of fresh ground water for secondary oil recovery is not "waste per se", we have not previously addressed the same issue with respect to use of fresh water for tertiary recovery. In *Texas County Irrigation v. Cities Ser. Oil Co.*, 570 P.2d 49 (Okl.1977), we stated "these views (that use of fresh water for secondary oil recovery is not waste per se) do not mean fresh ground water use in a water flood secondary oil recovery program under any circumstance may not constitute waste. That is an administrative decision for the Board after individual proceedings before the agency where probative evidence may be admitted and given effect." We today adopt this view with respect to tertiary oil recovery.

■ In this case involving secondary and tertiary oil recovery, the Board made a

---

7. The Oklahoma Administrative Procedures Act, 75 O.S.1981, § 312, provides:
 "A final order shall include findings of fact and conclusions of law, separately stated. Findings of fact, if set forth in statutory language, shall be accompanied by a concise and

explicit statement of the underlying facts supporting the findings."

8. Oklahoma Water Resources Board Rules, Regulations and Modes of Procedure, 1979 rev. ed. p. 9.

general finding that Mobil's operations would not result in waste:

"5. The Board further finds and determines based upon the testimony, exhibits and evidence presented, that applicant's intended use of the fresh ground water subject of this application is for secondary and tertiary oil recovery; that such intended use is and constitutes, under the facts presented and as contemplated under the laws of the State of Oklahoma and rules and regulations of the Board, a beneficial use of ground water; and further, under the evidence presented and as contemplated by law, waste, by virtue of applicant's intended use, will not occur. With regard to this finding and determination, the Board acknowledges the variously related concerns and objections of protestants, the same said concerns and objections being generally that the granting of the subject application would result in waste. Respecting these objections and concerns, the Board finds and determines that such objections are not supported nor sustained by, and are contrary to, the reliable, competent, and substantial evidence presented herein, the same being as reflected by the testimony and all exhibits presented, and such objections cannot therefore be sustained."

However, the specific probative evidence upon which the Board presumably based its general conclusion that waste—waste by pollution, *as well as* waste by depletion—will not occur, is not included in the order. Mere recitation that the Board finds that waste will not occur is insufficient. A finding of no waste must be supported by evidence in the record.

The evidence, as reflected by the testimony and exhibits of the administrative hearing, establishes indisputably that the tertiary process proposed by Mobil is one in which detergent additives and polymers will be mixed with the fresh water to reduce the water's surface tension so that more oil can be recovered from the formation. Mobil, nevertheless, presented absolutely no evidence identifying these specific chemical additives; or whether these unidentified chemical additives were harmful or harmless; or whether the water contaminated by these unidentified chemical additives could possibly later be reclaimed through treatment. Mobil's representatives stated only that the contaminated water would be disposed of "somehow".

Further, the record of the administrative hearing shows Mobil presently has no program to monitor on a regular basis the drop in the Ogallala water level, resulting from Mobil's mining activities. Furthermore, the record plainly shows that Mobil failed to sufficiently comply with Rule 820.1 of the Oklahoma Water Resources Board's Rules, Regulations and Modes of Procedure. This rule requires an applicant, in addition to meeting all the other requirements in applying for a permit to use fresh ground water, to submit to the Board:

(c) "An economic study containing the following information:

(1) A detailed analysis of the relative cost of obtaining salt water and any other feasible alternative versus the relative cost of obtaining fresh water,

(2) Total project costs and the amount of oil or gas expected to be recovered and the value expected to be realized,

(3) The estimated value of fresh water for other purposes (purposes or uses common to the area or vicinity subject of the application) as measured against the overall estimated value of the oil or gas to be recovered,

(4) The additional expense per barrel recovered if the applicant is required to use or treat salt water instead of fresh water in the recovery process, and

(5) An evaluation of other recovery methods or alternatives considered and why recovery requiring the use of fresh water was deemed to be necessary or the most feasible."

The only cost comparison presented by Mobil was that of oil recovery as measured against irrigation of certain agricultural crops. Comparative estimates of other types of existing beneficial uses were not

submitted. Additionally, no accounting figures were offered with regard to the cost and possible feasibility of utilizing treated salt water for tertiary recovery, rather than fresh water. The evidence did indicate, however, that fresh water once used in the tertiary process cannot be used again.

■ Inasmuch as it is the duty of the Board to protect against waste of ground water by depletion, as well as waste of ground water by pollution, a consideration by the Board of waste in this context is mandatory. In this regard, 82 O.S.1981, § 1020.15(3), is instructive:

"The Board shall not permit any fresh ground water user to commit waste by ... taking any fresh ground water in any manner so that the water is lost for beneficial use."

■ Finally, we note that Mobil's 20-year "temporary" permit was granted prior to a determination of the maximum annual yield of the Ogallala formation. Nevertheless, according to Water Resources Board Rule 840.4, (adopted 4–12–79), Mobil is entitled to annual *automatic* revalidation of this permit based solely upon a statement of rate of consumption, without reference to any objective standard of reasonable usage. Rule 840.4 provides:

"840.4 ANNUAL REVALIDATION AND EXPIRATION OF TEMPORARY GROUND WATER PERMITS: A temporary ground water permit must be revalidated annually during its term. Water use report forms will be mailed in January to each temporary permit holder. *Return of the completed, signed, and dated water use report form to the Board within thirty (30) days of receipt will automatically revalidate a temporary ground water permit whose revalidation is not protested.* If revalidation is protested, the temporary permit will not be automatically revalidated but will be submitted to the Board for consideration. The temporary permit shall lapse at expiration of its term, revocation, cancellation, suspension, or upon the issuance of a regular permit, whichever shall occur first." *(Emphasis ours.)*

The rule, *above*, thus effectively repeals, by administrative fiat, the substantive legislatively prescribed safeguards which distinguish between a regular and temporary permit. These statutory safeguards are expressly provided by 82 O.S.1981, § 1020.-11(A) and (B):

"A. Regular Permit. A regular permit is an authorization to put groundwater to beneficial use for other than domestic purposes. *The regular permit shall be granted only after completion of the hydrologic survey and determination of the maximum annual yield for the appropriate basin or subbasin.* It can be revoked or cancelled only as provided by Sections 1020.12 and 1020.15 of this title. *(Emphasis added.)*

B. Temporary Permit. A temporary permit is an authorization for the same purposes as a regular permit but *granted by the Board prior to completion of the hydrologic survey and the determination of the maximum annual yield of the basin or subbasin.* Unless requested by a majority of owners of the land, the water allocated by a temporary permit shall not be less than two (2) acre-feet annually for each acre of land owned or leased by the applicant in the basin or subbasin; provided, however, if the applicant presents clear and convincing evidence that allocation in excess of two (2) acre-feet annually for each acre of land overlying the basin or subbasin will not exhaust the water thereunder in less than twenty (20) years, then the Board may issue temporary permits in such basin or subbasin in such amounts in excess of said limitation as will assure a minimum twenty-year life for such basin or subbasin. *A temporary permit must be revalidated annually during its term.* The permit shall lapse at expiration of its term or upon the issuance of a regular permit, whichever shall occur first. It is subject to revocation or cancellation as provided in Sections 1020.12 and 1020.15 of this title." *(Emphasis added.)*

Clearly, the sole statutory protection against excessive depletion of ground water resources upon which a temporary permit is conditioned is an annual review of the original temporary authorization. In conformity with Legislative intent that allocation of ground water resources be based upon reasonable regulations,[9] the holder of a temporary permit must, therefore, annually substantiate the legal foundation of its original temporary permit. The term "revalidate" in this context necessarily possesses an element of legal strength and force, and inconsistent positions have no such force. Consequently, the requirements provided in 82 O.S.1981, § 1020.9, *supra*, are equally applicable to the revalidation process. Accordingly, an applicant for revalidation must re-establish (1) that the lands owned or leased by the applicant overlie the fresh ground water basin or subbasin; (2) that the use is a beneficial use; and, (3) that waste (by depletion or pollution) will not occur. Otherwise, in the absence of protest, the routine granting of temporary permits becomes tantamount to the ex parte issuance of a regular permit and the requirements of hydrologic surveys and the determination of annual yields become meaningless.

In the case of *Lowrey v. Hodges*, 555 P.2d 1016 (Okl.1976), we held that "[a] temporary permit is *not* tantamount to a regular permit in that the statute provides it must be revalidated annually." *(emphasis added.)* Automatic revalidation is directly inconsistent with the position taken by this Court in *Lowrey* that "[i]t [a temporary permit] is thus subject to *review* on a yearly basis and possible nonrenewal", *(emphasis added.)*, and ignores the statutory mandate to the Board to provide reasonable

regulations for the allocation for reasonable use of fresh ground water resources. *See,* 82 O.S.1981, § 1020.2, *supra. Also, see, Adams v. Professional Practice Comm'n,* 524 P.2d 932 (Okl.1974), which holds that an administrative agency may not under the guise of its rule making power act contrary to the statute which is the source of its authority. Water Resources Board Rule 840.4, *supra,* does not conform with the authorizing statute and is therefore without force.

 Inasmuch as it is deemed essential to a proper disposition of the issues presented by Mobil under the facts of this case, we remand this matter to the Water Resources Board for the taking and consideration of further evidence consistent with the dictates of this opinion.[10] Upon rehearing, the Water Resources Board is instructed to receive evidence and make essential findings of fact to determine whether waste by pollution, as well as waste by depletion, will not occur. The Board is further instructed to have further hearing on the hydrological survey and determination of the maximum annual yield of the Ogallala fresh water basin. Further, the Board before issuing permits for use of fresh ground water for tertiary recovery should do so only with the benefit of rules and regulations tailored to focus inquiry upon the pertinent issues peculiar to the tertiary process.

 This Court recognizes the practical problem of allocating proportionate use of ground water without the important determination of a realistic maximum annual yield and the present status of recharge and discharge of the water basin. However, the Board's issuance of a permit must meet all statutory requirements, including,

---

9. The intent of the Legislature, as evidenced by 82 O.S.1981, § 1020.2, provides in pertinent part: "It is hereby declared to be the public policy of this state ... to utilize the groundwater resources of the state, and for that purpose to provide reasonable regulations for the allocation for reasonable use based on hydrologic surveys of fresh groundwater basins or subbasins to determine a restriction on the production, based upon the acres overlying the groundwater basin or subbasin."

10. The Oklahoma Administrative Procedures Act, 75 O.S.1981, § 322, provides:
"(2) The reviewing court, also in the exercise of proper judicial discretion or authority, may remand the case to the agency for the taking and consideration of further evidence, if it is deemed essential to a proper disposition of the issue."

"allocation for reasonable use" and "restriction of the production" based upon information provided by hydrologic survey. We interpret inquiry into these matters to be legally necessary and reasonable in order that the water resources of our state may be utilized responsibly.

The decisions below are REVERSED, and this matter is hereby REMANDED WITH INSTRUCTIONS to the Water Resources Board.

HODGES, DOOLIN and OPALA, JJ., concur.

KAUGER, J., concurs specially.

BARNES, C.J., LAVENDER and HARGRAVE, JJ., and ROBINSON, S.J. (appointed in place of SIMMS, V.C.J. who disqualified), concur in part, dissent in part.

ROBINSON, S.J., concurring in part, dissenting in part:

I concur with Part I and II of the majority opinion but must respectfully dissent from Part III of said opinion. I dissent from the concurring opinion. I do not dissent, however, to those portions of the majority opinion and the concurring opinion dealing with the "automatic" revalidation of a temporary permit under the Water Resources Board's (Board) rule 840.4.

I recognize that the question and issue of waste has never been raised or presented by any party for review. All of Appellants' assignments of error in both the petition in error and the briefs relate solely to the trial court's ruling that the water could not be used away from the lands beneath which the water was withdrawn. Appellee did not cross-appeal. I would therefore follow this court's settled rule that appellate jurisdiction and authority is limited to issues raised and presented for review and ruling. I am compelled, however, to address what I think are the majority and concurring opinions erroneous conclusions concerning waste by pollution.

After an exhaustive review of the record and applicable statutes, I am convinced

that the Order of the Board has a substantial basis in evidence and that Mobil Oil Corporation (Mobil) proved the essential elements required by 82 O.S.1981 § 1020.9: (1) that Mobil leases lands overlying the Ogallala formation; (2) that Mobil's intended use was a beneficial use; and (3) that neither waste by pollution nor waste by depletion would occur. I also conclude that the Board's order contained essential findings of fact as required by 75 O.S.1981 § 312 concerning the absence of waste.

I

FACTS IN EVIDENCE

Mobil holds valid groundwater leases covering 3,442 acres overlying the Ogallala water basin. Mobil's intended use of the fresh water is for secondary and tertiary oil recovery. Mobil proposes to withdraw 6375.03 acre-feet of fresh groundwater annually during a projected 20 year life of its oil and gas recovery project with an average of .744 acre-feet of fresh groundwater per acre of leased ground water rights being withdrawn annually. Maximum use would occur in 1993 when 1.852 acre-feet of fresh groundwater would be withdrawn and minimum use would occur in 1998 when .209 acre-feet of fresh groundwater would be withdrawn. Such use could be characterized as minimal when compared with irrigation and other uses. The use of fresh water allows 240% increase in oil recovery while utilizing only 5% of the fresh water required to irrigate the same area of land. The income generated with 5% of irrigation requirements is 480% more than 100% irrigation requirements. 21,556,000 barrels of secondary oil would be produced plus 30 million barrels of tertiary oil for a total of 51,556,000 barrels of oil. Based on an average of $15.00 per barrel for secondary oil and $30.00 per barrel for tertiary oil a total gross revenue of $1,223,340,000. would be shared by 800 mineral owners and 55 working interest owners.[1] It should be noted that this income would also provide gross production tax revenue

---

1. In May, 1981, the price of oil was decontrolled. The price of oil today in the Oklahoma Panhandle area is $27.85 per barrel. *Kerr-McGee Refining Corporation's Crude Oil Price*

(at the present rate of 7.1%) of $86,857,-140.00 to the State of Oklahoma. In addition natural gas is the energy source for nearly all irrigation wells.

In an economic study, Mobil compared the relative cost of salt water versus fresh water. Case studies showing a comparison of the Hugoton, Glorietta and Shawnee salt water with Ogallala fresh water were presented. The Hugoton gas zone-produced-brine water was not acceptable due to a required network of pipelines of 4,620 miles in length covering 128 townships. The Glorietta brine water was chemically and physically incompatible with the producing formation Morrow connate and free water within the Morrow formation. More importantly the Glorietta water contained significant calcium and magnesium in solution and when mixed with Morrow formation water precipitates huge volumes of calcium sulfate commonly known as gypsum, relatively insoluble, and calcium carbonate, resulting in formation plugging of the oil producing wells at the time the water breaks through in the pressure maintenance operations. Plus the Glorietta water is saturated with carbon dioxide and thus is extremely corrosive to any distribution system. The Shawnee brine water also contains large volumes of calcium and

magnesium producing calcium sulfate and calcium carbonate which can plug the producing oil wells. Significant amounts of remaining secondary reserves would be lost using Shawnee brine water plus a total loss of tertiary reserves [2] of 30 million barrels. Numerous times Mobil's witnesses testified that the low tension water flooding which is the tertiary process could not utilize salt water. Mobile's witness also testified that although salt water could be used in the secondary recovery phase it would not result in the use of less fresh water because before tertiary could be initiated the salt water would have to be flushed out of the formation by the use of the Ogallala fresh water in order to condition the reservoir for tertiary. Lastly the record reflects that the fresh groundwater is recycled time after time in this closed injection system and that only makeup water is added to replace the displaced oil and gas from the formation so that volumes and pressures in the system may be maintained.

## II

## DOES MOBIL'S BENEFICIAL USE CONSTITUTE WASTE?

I will address initially my belief that the majority and concurring opinions apply cer-

*Bulletin,* # 91, Effective December 1, 1984 at 7 a.m. Therefore, the total gross revenue today for both secondary and tertiary oil would be $1,435,834,600.

2. It might be helpful to explain "primary, secondary and tertiary recovery". Primary production ends when the reservoir is incapable of efficient production due to a loss of energy. Secondary recovery primarily by waterflooding is then instigated to increase the amount of oil that can be produced. Water is injected into an oil reservoir for the purpose of washing the oil out of the well. H. Williams and C. Myers, Oil & Gas Law, Manual of Oil & Gas Terms 821 (1981). Tertiary recovery is best described by Mobil's expert witness at the Board's hearing on August 16, 1979:

"Mr. Irwin: As of the end of primary we initiate secondary, so now we have a third method trying to recover that oil remaining after the primary and secondary, recalling that there is still from 50% to 70% of the oil that is still there that was originally there, and this oil primarily was recoverable, is primarily trapped in the pore spaces by capillary action. A demonstration of capillary action is best shown if you can

think of the small cracked (sic) glass, straw, if you please dipped into a glass of water. First you will notice that the water in the straw will rise above the level of the water in the glass. This is the capillary action, the surface tension, the water as it rises in the tube is exactly what's happening between the sand grains in the sandstone and the force to remove that, as we know it today, and I'm talking about brute force, is more force than we have. The only way that we can overcome this is to wet this rock with, in laymen's terms, a detergent. It virtually eliminates surface tension, virtually in the areas contacted. If you don't contact the area with detergent it's still there. So by 'tertiary' we reduce the surface tension allowing more oil to be removed from that formation, but again we're talking probably even less percentage wise than we did in the primary and secondary.... The soap detergent simply is, I think the word is, soluable, reactive and salt water is far, far, far, less than the reaction you will get in fresh water, almost to the point that, it would not be effective in a tertiary operation."

tain statutes concerning waste (namely 82 O.S.1981 § 1020.15 and 82 O.S.1981 § 926.-1) that the Legislature clearly did not intend to be applied in the instant controversy involving the issuance of a permit under 82 O.S.1981, § 1020.9.

82 O.S.1981 § 1020.15 is entitled *Waste—Prosecutions* and states "the Board shall not permit any fresh groundwater user to commit waste by: ..." and then lists a series of definitions concerning what waste actually is under the groundwater law and which *may* occur after the permit issues under § 1020.9. Thus § 1020.15 is not concerned with the issuance of permits but rather provides for prosecution against the commission of waste. Section 1020.15 provides for filing of a complaint and also provides for suspension of the permit. This statute involves the misuse of fresh groundwater and is not to be used as a requirement or a condition precedent to issuance of a fresh groundwater permit.[3] This court has previously held that what § 1020.15 contemplates and addresses is "after-the-fact" occurrences of waste, i.e. waste, and the prosecution for same, that occurs at some future point subsequent to the issuance of a permit. *Lowrey v. Hodges*, 555 P.2d 1016 (Okl.1976). *Lowrey* provides at page 1023:

> We further find that the definitions of waste set forth in 82 O.S.1975 Supp. § 1020.15 contemplate an after-the-fact finding of waste and set out the procedure for criminal prosecution, injunction, and suspension of a permit when and if it occurs.

Accordingly the definitions of waste under § 1020.15 are inapplicable in the instant appeal which involves the issuance of a permit under § 1020.9 and not an alleged commission of waste, after-the-fact, under § 1020.15.

The second statute which I believe is not applicable to the issuance of a permit under the Oklahoma Groundwater Law, 82 O.S. §§ 1020.1 *et seq.*, is 82 O.S.1981 § 926.1

defining pollution. The § 926.1 definition of pollution is found in a totally separate act from the Oklahoma Groundwater Law. 82 O.S.1981 §§ 926.1 to 926.13 is an act entitled Pollution Remedies and was enacted in 1972. The Oklahoma Groundwater Law Act became effective July 1, 1973. These are two distinct acts and in my opinion deal with two distinct subjects. Section 926.2 of the Pollution Remedies Act is entitled Declaration of Policy and states:

> Whereas the pollution of the waters of this state constitutes a menace to public health and welfare, creates public nuisances, is harmful to wildlife, fish and aquatic life, and impairs domestic, agricultural, industrial, recreational and other legitimate beneficial uses of water, and whereas the problem of water pollution of this state is closely related to the problem of water pollution in adjoining states, it is hereby declared to be the public policy of this state to conserve the waters of the state and to protect, maintain and improve the quality thereof for public water supplies, *for the propagation of wildlife, fish and aquatic life and for domestic, agricultural, industrial, recreational and other legitimate beneficial uses; to provide that no waste be discharged into any waters of the state without first being given the degree of treatment necessary to protect the legitimate beneficial uses of such waters;* to provide for the prevention, abatement and control of new or existing water pollutions; and to cooperate with other agencies of this state, agencies of other states and the federal government in carrying out these objectives. [Emphasis added]. 82 Okla.Stat. § 926.2 (1981).

Section 926.13 of the Pollution Remedies Act states the Act's purpose and construction to be:

> It is the purpose of this act to provide additional and cummulative remedies to prevent, abate and control the pollution

---

**3.** It should be noted that the Board's order granting the permit does not find that waste will not occur under 82 O.S.1981 § 1020.15 but cited

82 O.S.1981 § 1020.9 after it found that waste would not occur.

of the waters of this state.... 82 Okla. Stat. § 926.13 (1981).

The purpose therefore of the Pollution Remedies Act is totally distinct and separate from the purpose of the Oklahoma Groundwater Law Act. The former deals with a use which attributes itself to pollution such as discharging waste into the waters of this state. It concerns the control of municipal sewage disposal systems, the issuance of permits for the discharge of waste into the waters of the state and provides penalties. This Act has nothing to do whatsoever with the issuance of a permit to use fresh water under the Oklahoma Groundwater Law, 82 O.S.1981 §§ 1020.1 *et seq.* As the majority opinion concludes, the Groundwater Law Act adopted a policy of "utilization" of water and only those statutes pertaining to the granting of a groundwater permit should apply in the instant case. This case deals with the consumptive use of ground water under the Groundwater Law Act as distinguished from the Pollution Remedies Act dealing with the control and prevention of discharge into state waters of industrial wastes.

The only statute I perceive that is applicable to the present controversy dealing with the issuance of a fresh groundwater permit is 82 O.S.1981 § 1020.9 which provides that the Board "shall" issue a permit if, among other things, it finds: "... that waste will not occur ...". We therefore must determine the meaning of the word "waste" under this particular section only, with the cautionary requirement that waste must be given a *reasonable* meaning so that the legislative policy of utilization of Oklahoma's groundwater will not be thwarted.

Appellees contended at the hearing (albeit without presenting evidence) that the fresh groundwater used by Mobil in these five units would be totally destroyed and polluted and "lost to the use of man". Appellee also expressed concern that this "polluted" water would somehow escape the formation and migrate upwards reaching the Ogallala or other groundwater formations and polluting same. The majority and concurring opinions imply that the addition of the polymers to fresh water results in pollution.

While it is true that the groundwater would undergo changes as it is being utilized in the secondary and tertiary operations,[4] it is also true that water used in irrigation changes its chemical characteristics as it percolates through fertilizer and other chemicals sprayed on crops and through the surface of the earth. Changes in water also occur during domestic and other industrial uses when fresh water absorbs dirt, sewage, detergents and other chemicals. After use, all groundwater changes its chemical characteristics and composition. Nowhere in the Groundwater Law does it say that the changing of fresh water chemical characteristics is pollution.

As a result of the reduced pressure on the surface as compared with the pressure in the Morrow formation, some of the groundwater produced in solution with the oil vaporizes and is returned to the hydrological water cycle. The water remaining in the oil producing formation at the end of the tertiary process will remain there for whatever purpose the Board dictates. The Board retains jurisdiction for any "after-the-fact finding of waste" as contemplated in *Lowrey*, and it is certainly conceivable that the Board could dictate that Mobil retrieve said water and treat it. The water

**4.** It should be noted that the majority opinion is only concerned with the "pollution" of the fresh water by the addition of polymers in the tertiary recovery and not with the "pollution" of the fresh water in the secondary recovery. While the fresh water will have no polymer additives in the secondary stage, it will change its characteristics from fresh water when it encounters salt water in the formation, i.e. the fresh water

mixes with the salt water in the formation and no longer is fresh potable water. Because the majority's definition is that any chemical change of fresh water is pollution and thereby waste then any permit for fresh water use in secondary recovery must be denied in contravention of *Texas County Irrigation v. Cities Service Oil Co.,* 570 P.2d 49 (Okl.1977).

used by Mobil is certainly not destroyed or its use lost to man.

The case of *Hodges v. Oklahoma Water Resources Board*, 580 P.2d 980 (Okl.1978) supports my position that the use by man whereby fresh water's chemical characteristics are changed is not waste by pollution in the context of the Oklahoma Groundwater Law. In *Hodges*, this Court cited *Lowrey* and stated that protestants had presented some evidence that the total mineral content of domestic wells in the area might be increased when the irrigation water filtered back into the groundwater formation causing the quality of the water to be diminished. This Court stated that such evidence however was inconclusive. In the present case Appellees have not presented any evidence, let alone evidence that the change of the groundwater's chemical characteristics · by industrial use in secondary and tertiary oil recovery is, under this utilization statute, waste by pollution. Such a conclusion would result in an absurdity rendering the statutes meaningless, and would violate the evident legislative intent that the Oklahoma Groundwater Law has as its purpose the utilization of the groundwater resources of the State of Oklahoma.

The *Lowrey* case is also instructive wherein this Court stated:

> Regarding the question of waste, the Appellees contend the evidence in each particular case, including facts officially noticed in the record, must show that waste will not occur as provided in 82 O.S.1975 Supp. § 1020.9. We would agree that an applicant must show what method he intends to use for irrigating a particular area; but once that information has been furnished the Board, it then has the authority to determine that waste will not occur. *If the Protestants think that waste will occur, they would need to present that evidence to the Board for its consideration.* Here, the Appellants introduced their plan to the Board and the plan was approved by the Board as not being wasteful.
>
> *If the plans submitted to the Board do not on their face demonstrate such*

> *waste, and the Protestants fail to introduce evidence to substantiate that waste will occur, and the Board finds that waste will not occur, the statute has been satisfied and further questions concerning waste must await completion of the project.* [Emphasis added]. *Lowrey v. Hodges*, 555 P.2d 1016, 1023 (Okl.1976).

In addition, I would like to point out that there is substantial evidence in the record to support the conclusion that no waste by "depletion" will occur. Evidence shows this is a closed system which serves as a container for the groundwater as well as the oil and gas and there is no danger that the chemicals will reach the Ogallala or any other groundwater formations. Also the water used is continuously recycled with only "makeup" fresh groundwater being required to replace the deplaced oil and gas recovered from the reservoir.

In conclusion, I find the Board's order was supported by substantial competent evidence that waste, commensurate with the legislative intent concerning the utilization of groundwater under the statute, would not occur. In *Texas County Irrigation v. Cities Service Oil Co.*, 570 P.2d 49 (Okl.1977) this Court allowed the use of fresh groundwater in secondary oil recovery even though the fresh groundwater characteristics are changed to salt water while in the formation. This Court decided that secondary flooding operations were not waste per se and the majority opinion affirms this holding. I would agree that all use of fresh groundwater for secondary or tertiary oil recovery is not per se or "of itself" waste under the groundwater law, and under the evidence of the instant case polymer flooding has not been shown to be waste by pollution or depletion.

## III

### WHAT EFFECT DOES THE MAJORITY'S VIEWS HAVE ON OUR DEPLETING GROUNDWATER SUPPLIES?

Even though I think, as outlined above, the utilization policy of our groundwater

law, the language of the statutes, and the evidence presented in this case dictates the above result, I agree with my colleagues on the majority and concurring opinions that we need to be gravely concerned about the frightening depletion of the Ogallala aquifer underlying our state and several other western states. I disagree however that the majority and concurring opinions conclusions will solve this problem. On the contrary, I believe the result of these opinions will be continued high depletion rates with detrimental economic consequences for the State of Oklahoma.

Since the majority and concurring opinions imply that the change of fresh water characteristics and chemical content is waste by pollution requiring denial of any fresh water permit under the groundwater law, on remand Mobil will not prevail and will not receive a fresh water permit for secondary and tertiary recovery of oil as both methods "pollute" the fresh groundwater. I also believe that as a result of these opinions other industrial and agricultural uses of water will be in question and prohibited as waste by pollution. Effectively therefore these opinions will legislate and change our statute from a utilization statute to a conservation statute. In my opinion this will not, however, prevent the depletion of the Ogallala aquifer. Why? Because the states surrounding Oklahoma will continue to utilize the aquifer's water far in excess of its recharge rate. Even though as pointed out in the concurring opinion, Texas and other states are aware of the problem, they are not trying to curtail use but are only trying to find methods to "recharge" or replenish the aquifer. In my mind we will be merely denying ourselves water-dependent industrial and agricultural economic growth, as set out on page 19 footnote 45 of the concurring opinion, while not preventing a significant drop in the water table. With the refusal of Mobil's industrial project alone Oklahoma will be denying itself millions of dollars in tax revenues and income to mineral and interest owners, not to mention the fifty million barrels of oil lost to the people of the United States. Magnify this many times over if fresh water permits are not hereafter allowed for industry and agricultural pursuits because such use changes the chemical characteristics, thereby causing waste by pollution. Using the analogy of the concurring opinion, if the pie is going to be used up I want Oklahoma to have a piece of that pie so its economy will continue to prosper and grow as the surrounding states economies do by the use of the Ogallala aquifer.

As noted in a recent law review article: The valuation of water bothered Adam Smith in *The Wealth of Nations.* He asked: "How is it that water, which is so very useful that life is impossible without it, has such a low price—while diamonds, which are quite unnecessary, have such a high price? Modern economists explain this by using the microeconomic concept of utility, the theory that explains value according to the degree to which the thing valued contributes to man's most urgent necessities. The total utility of water does not determine its price or demand. Only the relative marginal utility and cost of the last little bit of water determines its price. Since we have an abundant supply of water today, the price is low. As water becomes scarce, its price will rise dramatically. See *P. Samuelson, Economics: An Introductory Analysis,* 424 (7th Ed.1967). Note: *Oil and Gas: Water and Watercourses: The Right to Use Fresh Groundwater in Waterflood Operations,* 35 Okla.L.Rev. 158, 166 n. 51 (1982).

I agree with the economic theory that when water becomes scarce the price will go up and then states will change their utilization policy to a conservation policy. Surely responsible state legislators and/or the federal government will solve this problem before the near depletion of the aquifer. The states on their own initiative could form interstate compacts to deal with this situation. The United States Supreme Court has already addressed the problem in *Sporhase v. Nebraska ex rel Douglas,* 458 U.S. 941, 102 S.Ct. 3456, 73 L.Ed.2d 1254

(1982). Due to the West and Southwest's water supply depletion several states passed legislation to prohibit or limit interstate transfers of groundwater. Nebraska's embargo statute was reviewed in *Sporhase* and the Court found the Nebraska Legislature violated the commerce laws and that groundwater was an article of commerce and subject to judicial restraints on state control and potential federal regulation. The Court stated: "the multistate character of the Ogallala aquifer—appellant's tracts of land in Colorado and Nebraska, as well as parts of Texas, New Mexico, Oklahoma, and Kansas—confirms the view that there is a significant federal interest in conservation as well as in fair allocation of this diminishing resource." *Sporhase v. Nebraska ex. rel. Douglas*, 458 U.S. 941, 953, 102 S.Ct. 3456, 3463, 73 L.Ed.2d 1254 (1982). It is argued that *Sporhase* gives Congress a clear invitation that it will find the constitutional road clear should it decide to address the problem of groundwater conservation and management.[5] As noted in the concurring opinion, the United States Senate has passed legislation funding study and construction of groundwater "recharge" projects in western states including Oklahoma and the Ogallala aquifer. I submit that these federal and/or combined state efforts are the only solution to prevent the threatened depletion of the southwest and west's limited water supply. Changing this State's policy from utilization to conservation and denying its inhabitants industrial and agricultural uses of the groundwater only results in an adverse economic impact to the state and does not prevent the exhaustion of the Ogallala aquifer.

## IV

## THE BOARD HAD ADEQUATE RULES AND THUS AUTHORITY TO ISSUE THE TEMPORARY PERMIT

The concurring opinion opines that because the Board had no rules specifically refering to tertiary recovery, it lacked authority to issue temporary permits to use fresh groundwater for tertiary oil recovery. The Board however at the time of the hearing had specific rules concerning secondary recovery setting forth the procedures to be followed before the Board. Subsequently all the Board did was to change the definition of Enhanced Recovery of Oil & Gas to include tertiary and changed the secondary recovery procedural rules to include tertiary recovery. No substantive changes were made to the secondary procedural rules. No additional or new rules concerning tertiary were needed. In my mind there is very little difference between secondary and tertiary recovery. The former uses fresh water which is changed to salt water in the formation and the later uses a polymer and fresh water. In both instances the fresh water's chemical characteristics are changed. The procedural rules have to be, and indeed are, identical for both secondary and tertiary recovery. Therefore, it is my belief that the Board had at the time of the hearing necessary and adequate procedural rules concerning the use of fresh water for enhanced oil recovery (both secondary and tertiary) and thus had the requisite authority to issue the temporary permit to Mobil.

## V

## TEMPORARY PERMIT REVALIDATION

I would agree with both the majority and concurring opinion that those holding temporary permits must annually substantiate the legal foundation for its original temporary permit and the provisions of 82 O.S. 1981 § 1020.9 must be complied with in order to "revalidate" a temporary permit. The Water Resources Board Rule 840.4 therefore is invalid because it provides for annual automatic revalidation of a temporary permit based solely upon a statement of rate of consumption unless the revalida-

---

5. Note, *Federal Intervention in Groundwater Regulation: Sporhase v. Nebraska, ex rel Doug-* *las,* 18 Tulsa L.J. 713 (1983).

tion is protested. Mobil must annually, upon the anniversary of the issuance of the temporary permit, present evidence at a hearing before the Board that the fresh groundwater continues to be used beneficially and that waste, as contemplated under the Act, will not occur.

## VI

### DOES THE BOARD'S ORDER CONTAIN ESSENTIAL FINDINGS OF FACT CONCERNING WASTE?

The Board's order states in part:

5. ... and further, under the evidence presented and as contemplated by law, waste, by virtue of applicant's intended use, will not occur. With regard to this finding and determination, the Board acknowledges the variously related concerns and objections of Protestants, the same said concerns and objections being generally that the granting of the subject application would result in waste. Respecting these objections and concerns, the Board finds and determines such objections are not supported or sustained by, and are contrary to, the reliable, competent, and substantial evidence presented herein, the same being as reflected by the testimony and all exhibits presented, and such objections cannot therefore be sustained.

The majority opinion states that "the specific probative evidence upon which the Board presumably based its general conclusion that waste—waste by pollution, *as well as* waste by depletion—will not occur, is not included in the order. Mere recitation that the Board finds that waste will not occur is insufficient. A finding of no waste must be supported by evidence in the record".

First I would point out that a "SUMMARY OF EVIDENCE PRESENTED" is attached to the Board's order wherein it is stated as follows:

The following objections were entered in the hearing record by Mr. Forrest Nelson, representing the Texas County Irrigation and Water Resources Association;

1. Mr. Nelson objected to the surface injection pressures to be used, which would range from 700 psi up to 2,000 psi, on the grounds that use of such pressure in this oil recovery operation would cause, through the existence of all improperly plugged wells in the area, pollution of the Ogallala fresh water formation, (Refer Exhibit 4F).

The Board finds however that this objection cannot be sustained for the reason that there was no evidence presented nor available otherwise, that such "improperly plugged" wells did exist in the area.

3. Mr. Nelson objected to the use of the fresh groundwater for secondary and tertiary oil recovery on the grounds that such use of fresh water would remove the water from the freshwater cycle and would cause the water to become polluted, and wasted.

The Board finds and determines, based upon testimony, exhibits and evidence presented that applicants intended use and manner of use subject of this application, all being summarized in greater detail above, is a beneficial and non-wasteful use of fresh groundwater as contemplated under the provisions of 82 O.S.Supp.1972, 1020.9.

In my view the above quoted portions could be nothing else but "essential findings of fact that waste will not occur based upon and supported by evidence in the record". Clearly therefore the Board's order complies with 75 O.S.1981 § 312, the Oklahoma Administrative Procedures Act.

The Board's Order significantly states "and further, under the evidence presented *as contemplated by law*, waste, by virtue of applicant's intended use, will not occur". Also significant is the fact that the Board in its finding of fact states that the use of fresh groundwater was not waste "as contemplated under the provisions of 82 O.S. Supp.1972, 1020.9". As discussed in Part III above, the conclusion that polymer flooding constitutes waste under 82 O.S. 1981 § 1020.9 clearly was not contemplated by the Legislature under the Oklahoma Groundwater Law. The Board's Order

therefore contains essential findings of fact to support a finding that waste will not occur by pollution or depletion in the process of secondary and tertiary oil recovery.

I am authorized to state that BARNES, C.J., concurs in the views expressed herein.

KAUGER, Justice, concurring.

I concur with the majority opinion, and with the finding that severed groundwater may be transported from leased lands. I write separately to articulate my reasons for concurring in the answers given by today's pronouncement.

I am still concerned with the responsibility we share to prevent the unbridled consumption of fresh groundwater and to exercise both the will and the wisdom to conserve the good earth, with the certain knowledge that unless we act, the Ogallala aquifer probably will be exhausted by the year 2020.[1] We cannot wait until tomorrow to worry about this problem. It must be faced today, before the last acre-foot of water is sucked from the breast of the Ogallala, and the Panhandle becomes a desolate desert—a stark and silent monument to our unwillingness responsibly to function, and a place where the price of water exceeds the price of oil.[2]

I can think of no commodity which affects and concerns the citizens of this state more than fresh groundwater. Fresh water is of great concern not only in this state; citizens in eleven other western states are anguished by the depletion of the Ogallala aquifer. Fresh water use, dominion, appropriation, and control are also being thrust into the arena of international politics. Canadian officials attending a water conference in Toronto, Ontario, June 13, 1984, expressed fears that growing demand for water from middle western and southwestern states, including continued deple-

tion of the Ogallala, will lead to large-scale diversion of water from the Great Lakes lowering the lakes' water level by over thirteen inches within the next fifty years.[3] Obviously, the issue of the use and control of fresh water is one *publici juris*, and of immediate local, national, and international concern.

I

BECAUSE OF ITS FAILURE TO COMPLY WITH THE ADMINISTRATIVE PROCEDURES ACT THE OKLAHOMA WATER RESOURCES BOARD LACKED AUTHORITY TO ISSUE THE TEMPORARY PERMIT

The refusal of the trial court to allow removal of severed water from the surface estate in a critical and sensitive groundwater area was, in effect, a finding that the use of fresh groundwater for enhanced oil recovery was not a beneficial use and constituted waste. The order of non-removal of the water from the place of origin renders the failure of the trial court to revoke the temporary permit immaterial because the issuance of the temporary permit was an invalid exercise of jurisdiction by the Oklahoma Water Resources Board (Board). The Board's failure to comply with the mandatory provisions of the Administrative Procedures Act, either by including sufficient separate findings of fact and conclusions[4] of law or by promulgation of rules, is a fatal procedural flaw.

Mobil filed its application to mine fresh groundwater for secondary and tertiary enhanced oil recovery on February 13, 1979; the Board conducted a hearing on Mobil's application on August 16, 1979, and issued its temporary permit on January 8, 1980. It was admitted by the Board's counsel, at oral argument, and it is reflected in the

1. *The New York Times,* "Canada Fears U.S. Use of Great Lakes Water", June 14, 1984. *The Sunday Oklahoman* "State's Future Hinges on Cool, Clear Water," December 16, 1984.

2. This has happened before. See R. Kerr, *Land, Wood & Water,* Ch. 3, p. 44 (Fleet Publishing Co. 1960).

3. See note 1, supra.

4. See 75 O.S.1981 § 312, majority opinion, note 5 supra.

record, that prior to 1979, the Board had failed to adopt and publish any rules concerning the use of fresh water for enhanced oil recovery. On April 12, 1979, two months after Mobil applied for a temporary permit, the Board adopted Rules 820 and 820.1 [5] pertaining to secondary oil recovery. On March 11, 1980, three months after the Board issued the temporary permit, the Board adopted new definitions [6] and revised Rules 820 and 820.1 to include tertiary recovery. At the time of the hearing, *no* rules existed on the subject of the rights of the parties or the proce-

dures to be followed before the Board regarding tertiary oil recovery. In any event, 75 O.S.1981 § 304(b)(1) indicates that the rules could not have been in effect prior to March 31, 1980.[7]

The Board falls within the definition of a state agency as characterized by the Administrative Procedures Act, 75 O.S.1981 § 302.[8] As such, it is required to promulgate and to file its rules and regulations with the Secretary of State and the State Librarian and Archivist. Any rule or regulation of the Board is void unless it is filed and published in compliance with 75 O.S.

---

5. The Oklahoma Water Resources Board Rules 820 and 820.1 promulgated on April 12, 1979 provide:

 "820. USE OF FRESH WATER FOR SECONDARY OIL RECOVERY

 820.1 USE OF FRESH WATER FOR SECONDARY OIL RECOVERY. Applicants filing for the use of fresh water for secondary oil recovery, in addition to all other requirements shall be required to furnish the following:

 (a) A copy of the easements or lease from the surface right owners giving the applicant the right to develop and use the fresh groundwater for secondary oil recovery;

 (b) An estimated schedule for use showing the amount of fresh water used each year in the recovery process;

 (c) An economic study containing:

 (1) The relative cost of obtaining salt water versus the relative cost of obtaining fresh water;

 (2) The amount of oil expected to be recovered and the value expected to be realized;

 (3) The estimated value of fresh water for other purposes as measured against the overall estimated value of the oil to be recovered, and

 (4) The additional expense per barrel for oil recovered if the applicant is required to use salt water;

 (d) An inventory of all wells, fresh water, salt water, oil, gas, disposal, injection, both active and abandoned, within two (2) miles of the proposed unitization; and

 (e) The permeability, thickness, and estimated porosity of the injection zone. The applicant may also be required to furnish other relevant material upon request which may include the following:

 (a) A copy of the unitization plan on file with the Corporation Commission;

 (b) A copy of each injection well application and the approval of such application by the Corporation Commission; and

 (c) A copy of all logs of each injection well showing the name of each zone containinng salt water."

6. The definition adopted provides that:

 "ENHANCED RECOVERY OF OIL AND GAS means any process using fresh water to recover substantial quantities of additional oil or gas which would not be recoverable under ordinary primary methods. This definition applies to all non-primary forms of oil and gas recovery including but not limited to secondary, tertiary, or other enhanced recovery operations."

7. Rules do not become effective until twenty days after proper filing pursuant to 75 O.S.1981 § 304(b)(1) which provides:

 "304. Filing of rules—Effective date

 (a) Each agency shall file copies of each rule adopted by it, including all rules existing on the effective date of this act, as required by 74 O.S.1961 § 251.

 (b) Each rule hereafter adopted is effective twenty (20) days after filing except that:

 (1) If a later date is required by statute or specified in the rule, the later date is the effective date; ...."

8. It is provided by 75 O.S.1981 § 302:

 "(a) In addition to other rule-making requirements imposed by law each agency shall:

 (1) adopt as a rule a description of its organization, stating the general course and method of its operations and the methods whereby the public may obtain information or make submissions or requests;

 (2) adopt rules of practice setting forth the nature and requirements of all formal and informal procedures available, including a description of all forms and instructions used by the agency;

 (3) make available for public inspection all rules and all other written statements of policy or interpretations formulated, adopted, or used by the agency in the discharge of its functions;

 (4) make available for public inspection all final orders, decisions and opinions."

1981 § 252.[9] The agency has no authority to conduct hearings until proposed rules have been promulgated in accordance with the Act.[10]

Administrative rules include any agency statement of general applicability and future effect which implements, interprets, or governs substantial law or policy, or which prescribes the procedure or practice requirements before the agency.[11] Procedural rules delineate the format for the agency to discharge its assigned duties and the guidelines for litigants to follow in order to deal effectively with the agency. Generally, these rules concern forms, instructions, and the availability for public inspection of all agency rules and policy.[12] Substantive rules affect individual rights and obligations and constitute the administrative equivalent of statutes.[13] The tardily promulgated rules for the use of fresh water for enhanced oil recovery are substantive because the rules require, *inter alia*, an easement or lease from the surface right owners, an economic study which requires an analysis of the cost of fresh water versus the cost of salt water, and the value of fresh water for the purposes measured against the value of the oil recovered—these rules are more than forms and instructions.

Substantive rules must be published to avoid the inherently arbitrary nature of published ad hoc determinations.[14] An unpublished substantive regulation cannot be given legal effect by the courts. The rationale for requiring administrative rulemaking is to protect both the public interest and the rights of the parties.[15] In *Adams v. Professional Comm'n.*, 524 P.2d 932, 934 (Okla.1974), this Court quoted with approval the language from *Boller Beverage Inc. v. Davis*, 38 N.J. 138, 183 A.2d 64, 71 (1962), the New Jersey Supreme Court said:

"... The object is not legislation ad hoc or after the fact, but rather the promulgation, through the basic statute and the implementing regulations taken as a uni-

9. The rules must properly be filed pursuant to 75 O.S.1981 § 251. Failure properly to file results in the rule being void and of no effect under the provision of 75 O.S.1981 § 252:

"Any rule or regulation, amendment, revision, or revocation of an existing rule or regulation made by an agency prior to the effective date of this act shall be void and of no effect unless filed as required by Section 1 of this act and, except to the extent otherwise provided in Section 3 of this act, any rule or regulation, amendment, revision, or revocation of an existing rule or regulation made by an agency after the effective date of this act shall be void and of no effect unless filed and published as required by Sections 1 and 5 of this act. All provisions herein shall also apply to all agencies that may hereafter be created. All courts, boards, commissions, agencies, authorities, instrumentalities, and officers of the State of Oklahoma shall take judicial or official notice of any rule or regulation, amendment, revision, or revocation of an existing rule or regulation duly filed, or duly filed and published under the provisions of this act."

10. *Adams v. Professional Practice Comm'n.*, 524 P.2d 932, 934 (Okla.1974); Cox, "The Oklahoma Administrative Procedures Act: Fifteen Years of Interpretation", 31 Okla.L.Rev. 886, 891 (1978).

11. It is provided by 75 O.S.1981 § 301(2) as follows:

"(2) 'Rule' means any agency statement of general applicability and future effect that implements, interprets or prescribes substantive law or policy, or prescribes the procedure or practice requirements of the agency. The term includes the amendment or repeal of a prior rule but does not include (A) the issuance, renewal or denial of licenses; (B) the approval, disapproval or prescription of rates; (C) statements concerning only the internal management of an agency and not affecting private rights or procedures available to the public; (D) interagency memoranda; or (E) declaratory rulings issued pursuant to Section 308 of this title; ...."

12. *State ex rel. Com'r of Ins. v. N.C. Rate Bur.*, 300 N.C. 381, 269 S.E.2d 547, 568 (1980).

13. *Chrysler Corp. v. Brown*, 441 U.S. 281, 301, 99 S.Ct. 1705, 1717, 60 L.Ed.2d 208 (1979). See also Schwartz, "Administrative Law", p. 186–189, § 4.14 (2nd ed. 1984).

14. *Morton v. Ruiz*, 415 U.S. 199, 232–236, 94 S.Ct. 1055, 1073–1075, 39 L.Ed.2d 270 (1974). See also Schwartz, "Administrative Law", p. 188–189, § 4.14 (2nd ed. 1984).

15. *Mazza v. Cavicchia*, 15 N.J. 498, 105 A.2d 545, 552 (1954), cited with approval in *Adams v. Professional Practices Comm'n.*, note 10, supra.

tary whole, of a code governing action and conduct in the particular field of regulation so those concerned may know in advance all the rules of the game, so to speak, and may act with reasonable assurance. Without sufficiently definite regulations and standards administrative control lacks the essential quality of fairly predictable decisions. Persons subject to regulation are entitled to something more than a general declaration of statutory purpose to guide their conduct before they are restricted or penalized by an agency for what it then decides was wrong from its hindsight conception of what the public interest requires in the particular situation."

Just as we are required to take judicial notice of the rules filed and published under 75 O.S.1981 § 252,[16] we must take official notice that *at the time of the hearing, there were no rules in existence concerning the use of fresh groundwater in tertiary oil recovery operations.* The Oklahoma Water Resources Board possesses only the authority conferred upon it by statute.[17] All orders and rules promulgated by the Board must conform with the statutes to be valid. Because no rules had been adopted by the Board, it had no authority to conduct a hearing, to take evidence, to make findings of fact, or to issue temporary permits to mine fresh groundwater for use in tertiary oil recovery. The issuance of the permit is void, invalid, and of no effect.

## THE RULES OF THE BOARD VIOLATE THE MOST FUNDAMENTAL PRINCIPLES OF PROCEDURAL DUE PROCESS, THEREFORE, ANY REVALIDATION OF A TEMPORARY PERMIT UNDER RULE 840.4 IS NULL AND VOID

In *Lowrey v. Hodges*, 555 P.2d 1016 (Okla.1976), this Court held that the issuance of a temporary permit is not tantamount to the issuance of a regular permit,[18] stating that the requirement of revalidation constituted a statutory safeguard which prevented a holder of a temporary permit or the Board from circumventing the need for hydrologic surveys and determination of annual yields.[19] The annual review of the temporary permit is the only protection against the temporary use of water becoming a permanent use of water.

However, in direct contravention of the *Lowrey* teaching, on April 12, 1979, the

16. See note 9, supra.

17. *Boydston v. State*, 277 P.2d 138, 142 (Okla. 1954).

18. *Lowrey v. Hodges*, 555 P.2d 1016 (Okla.1976). The definition of regular and temporary permit is found at 82 O.S.1981 § 1020.11(A) and (B): "A. Regular Permit. A regular permit is an authorization to put groundwater to beneficial use for other than domestic purposes. The regular permit shall be granted only after completion of the hydrologic survey and determination of the maximum annual yield for the appropriate basin or subbasin. It can be revoked or canceled only as provided in Sections 1020.12 and 1020.15 of this title. B. Temporary Permit. A temporary permit is an authorization for the same purposes as a regular permit but granted by the Board prior to completion of the hydrologic survey and the determination of the maximum annual yield of the basin or subbasin. Unless requested by a majority of the owners of the land, the water allocated by a temporary permit shall not be less than two (2) acre-feet annually for each acre of land owned or leased by the applicant in the basin or subbasin; provided, however, if the applicant presents clear and convincing evidence that allocation in excess of two (2) acre-feet annually for each acre of land overlying the basin or subbasin will not exhaust the water thereunder in less than twenty (20) years, then the Board may issue temporary permits in such basin or subbasin in such amounts in excess of said limitation as will assure a minimum twenty-year life for such basin or subbasin. A temporary permit must be revalidated annually during its term. The permit shall lapse at expiration of its term or upon the issuance of a regular permit, whichever shall occur first. It is subject to revocation or cancellation as provided in Sections 1020.12 and 1020.15 of this title."

19. Title 82 O.S.1981 § 1020.5 provides: "The maximum annual yield of each fresh groundwater basin or subbasin shall be based upon a minimum basin or subbasin life of twenty (20) years from the effective date of this act."

Board adopted Rule 840.4.[20] This Rule provides that a temporary permit will be revalidated *automatically* on an annual basis during the twenty-year minimum basin or subbasin life-span unless revalidation is protested. The rule exceeds the Board's statutory authority [21] and denies due process of law to parties whose rights are affected by the rule. Procedural due process of law contemplates a fair and open hearing prior to agency action with notice and an opportunity to present evidence and arguments.[22] The rule is facially defective because (1) revalidation is automatic,[23] (2) no procedure is established to initiate a protest, (3) parties whose rights will be affected receive no notice of the pending revalidation, (4) the rule protects neither the public interest nor the rights of the parties,[24] and (5) the rule does not afford interested parties due process of law.

Mobil states "the attendance at the hearing and subsequent renewal hearings on this permit do not bespeak of more than limited protests to the permit." This statement is self-evident because interested and affected parties do not receive any notice concerning a hearing upon revalidation. Revalidation pursuant to § 1020.11(B) does not mean that the Board is to approve routinely the application for renewal.[25] The holder of the permit must substantiate the foundation for the original temporary permit and show that the fresh groundwater to be mined under the annual renewal will continue to be used beneficially and that waste has not, and will not, occur. To hold otherwise, would destroy the legislative intent that allocation of the groundwater resources of this State be based upon reasonable regulation premised upon meaningful agency oversight, including hydrologic surveys of fresh groundwater basins and subbasins. This intent is plainly expressed in our water laws [26] and there is no room for construction by this Court or by the Board.[27] The statutory language that "a temporary permit must be revalidated" is not a mandate to the Board to renew automatically each temporary permit issued—its purpose is to place the burden upon the permit holder to substantiate the need to continue withdrawal of water on a temporary basis, while awaiting completion

**20.** Oklahoma Water Resources Board Rule 840.4 provides:

"840.4 ANNUAL REVALIDATION AND EXPIRATION OF TEMPORARY GROUND WATER PERMITS: A temporary ground water permit must be revalidated annually during its term. Water use report forms will be mailed in January to each temporary permit holder. Return of the completed, signed, and dated water use report form to the Board within thirty (30) days of receipt will automatically revalidate a temporary ground water permit whose revalidation is not protested. If revalidation is protested, the temporary permit will not be automatically revalidated but will be submitted to the Board for consideration. The temporary permit shall lapse at expiration of its term, revocation, cancellation, suspension, or upon the issuance of a regular permit, whichever shall occur first."

**21.** *Adams v. Professional Practices Comm'n.,* note 10, supra.

**22.** *Jackson v. Independent School Dist No. 16,* 648 P.2d 26 (Okla.1982).

**23.** *Lowrey v. Hodges,* note 18, supra.

**24.** *Mazza v. Cavicchia,* note 15, supra.

**25.** Plain words are to be considered in their ordinary and common use. *State ex rel. Western State Hospital v. Stoner,* 614 P.2d 59 (Okla. 1980); Webster's Third New International Dictionary defines validate as "to corroborate or support in a sound basis or authority."

**26.** The intent of the legislature is found at 82 O.S.1981 § 1020.2 which reads:

"It is hereby declared to be the public policy of this state, in the interest of the agricultural stability, domestic, municipal, industrial and other beneficial uses, general economy, health and welfare of the state and its citizens, to utilize the groundwater resources of the state, and for that purpose to provide reasonable regulations for the allocation for reasonable use based on hydrologic surveys of fresh groundwater basins or subbasins to determine a restriction on the production, based upon the acres overlying the groundwater basin or subbasin. The provisions of this act shall not apply to the taking, using or disposal of salt water associated with the exploration, production or recovery of oil and gas or to the taking, using or disposal of water trapped in producing mines."

**27.** *Estate of Kasishke v. Oklahoma Tax Commission,* 541 P.2d 848, 851 (Okla.1975).

of water surveys and determination of annual yield. Automatic renewal of a temporary permit, based only upon a statement of rate of consumption, circumvents the need for a regular permit based upon hydrologic surveys, and the determination of the annual yield of a basin or subbasin to establish a minimum twenty-year life of a reservoir.[28] Thus, the automatic revalidations since the adoption of Rule 840.4 are void and invalid for lack of due process.

Prior to April 12, 1979, the Board had no rule, not even a defective one, promulgating the rights of interested parties concerning revalidation of any temporary permit. Without rules of procedure concerning matters within the Board's administrative expertise, it lacked authority to conduct a hearing, take evidence, make findings of fact or renew/revalidate temporary permits to mine fresh groundwater for use in secondary or tertiary oil recovery, or for any other purpose. Because of the absence of properly adopted and published rules, from 1973 to April 1979, the revalidation of *any* temporary permit, for *whatever* purpose is void and invalid.

**28.** See Appendices A and B.

**29.** Revised Rules and Regulations, § 125.1(g), April 12, 1979, states:
" 'Beneficial Use' is the use of such quantity of stream or groundwater when reasonable intelligence and reasonable diligence are exercised in its application for a lawful purpose and as is economically necessary for that purpose. Beneficial uses include but are not limited to municipal, industrial, agricultural, irrigation, recreation, fish and wildlife, etc."

**30.** Determination of maximum yield is found at 82 O.S.1981, § 1020.5, and provides:
"After making the hydrologic survey, the Board shall make a determination of the maximum annual yield of fresh water to be produced from each groundwater basin or subbasin. Such determination must be based upon the following:
1. The total land area overlying the basin or subbasin;
2. The amount of water in storage in the basin or subbasin;
3. The rate of natural recharge to the basin or subbasin and total discharge from the basin or subbasin;
4. Transmissibility of the basin or subbasin; and

III

## REASONABLE DILIGENCE AND REASONABLE INTELLIGENCE MILITATE AGAINST THE USE OF FRESH GROUNDWATER IN ENHANCED OIL RECOVERY OPERATIONS

Beneficial use is defined in the Board's Rules and Regulations as "the use of such quantity of stream or groundwater when reasonable intelligence and reasonable diligence are exercised in its application for a lawful purpose...."[29] The Board has authority to issue three types of permits: regular, temporary, and special. A regular permit authorizes beneficial use of groundwater for non-domestic purposes, and can be granted only after completion of a hydrologic survey and determination of the maximum annual yield for the appropriate basin or subbasin. A temporary permit may be issued for the same purposes as the regular permit, but it is not conditioned upon either a hydrologic survey or a determination of maximum annual yield of water to be allowed to each acre overlying the aquifer.[30]

5. The possibility of pollution of the basin or subbasin from natural sources.
The maximum annual yield of each fresh groundwater basin or subbasin shall be based upon a minimum basin or subbasin life of twenty (20) years from the effective date of this act."
Also, 82 O.S.1981 § 1020.6 states:
"Once such hydrologic survey has been completed and the Board has set a tentative maximum annual yield for the basin or subbasin, the Board shall call and hold hearings at centrally located places within the area of the basin or subbasin. Prior to such hearings being held, the Board shall make copies of such hydrologic survey available for inspection and examination by all interested persons and, at such hearings, shall present evidence of the geological findings and determinations upon which the tentative maximum annual yield has been based. Any interested party shall have the right to present evidence in support or opposition thereto.
After such hearings are completed, the Board shall then proceed to make its final determination as to the maximum annual yield of water which shall be allocated to each acre of land overlying such basin or subbasin. The Board may, in subsequent basin or subbasin hearings, and after additional hydrologic sur-

All permits are allocated on the basis of acre-feet of water. One acre-foot of water is that amount of water which it takes to cover one acre of land with one foot of water and contains 325,850 gallons of water. As a matter of law, an applicant who secures a temporary permit is annually allocated "not less than two acre-feet" of water per acre. This allocation must be revalidated annually during its term, and it lapses either at the expiration of its term or upon the issuance of a regular permit, whichever occurs first.[31] Under current Rule 840.4 once a temporary permit is granted, it is renewed automatically without further hearing. No term of years is mentioned in the statutes, except a prohibition against depletion of a water aquifer in less than twenty-years. Therefore, the Board allows the holder of a temporary permit twenty years within which to exhaust a water source without ever determining how much fresh water is present in the aquifer. The two acre-feet per year per acre overlying the aquifer is a minimum allotment; if the applicant seeks to extract more water, a hydrologic study must be submitted to the Board to support any request in excess of the statutory apportionment. Because of the statutory requirement that a temporary permit must be revalidated annually, it is unlikely that any applicant would go to the expense of providing a hydrologic study.[32] Meanwhile, even though there was some evidence presented at oral argument that the recharge rate of the aquifer is no more than one inch per year, the maximum annual yield has not been determined. The "pie" is being divided without a determination of the size of the pie—yet everyone is consuming the pie.

Mobil adduced evidence at the hearing on the temporary permit that over the twenty-year life-span of the Ogallala aquifer Mobil's enhanced oil recovery program would consume 51,211 acre-feet of water—approximately 16 billion gallons of water. Mobil projected that its maximum use would occur in 1993, when 1.852 acre-feet of water per acre would be withdrawn, and its minimum use would occur in 1998, when .209 acre-feet of water per acre would be utilized. The average annual use calculated upon an expected but unproven twenty-year life-span of the aquifer is .744 acre-feet of water per acre. If Mobil uses the amount of water it says it will use, a lake the size of Lake Wister at normal level will disappear forever from the groundwater reservoir. If Mobil uses the amount of water it has the *right* to use under the terms of the temporary permit, (6,375.03 acre-feet of water per year for the next twenty-years at a rate not to exceed 15,214 gallons of water per minute) Mobil can fill a family-size swimming pool every minute; it can fill an Olympic-size swimming pool every twenty-three minutes; it can drain Lake Heyburn within a year; it can drain Lake Fort Supply within 2½ years; it can drain Lake Wister within seven years; or, it can exhaust Lake Canton within eighteen years.[33] Although Mobil stated that it would use less water than the statute allowed, plaudits cannot be awarded to one who uses only half the permissible allocation, if an amount less than the allocation is recharged on an annual basis.

The High Plains (Ogallala) aquifer underlies 174,000 square mile area of flat to gently rolling terrain including part of the oil-producing states of Colorado, Kansas, Nebraska, New Mexico, Oklahoma, South Dakota, Texas and Wyoming. In some places, the water table has dropped more than 100 feet over the last forty years. The depletion of the aquifer presents the spectre of present and future severe water shortages. To combat this situation, federal legislation is being considered to study ways artificially to recharge the Ogallala

veys, *increase the amount of water allocated but shall not decrease the amount of water allocated.*"

**31.** See note 18, 82 O.S.1981 § 1020.11(B) supra.

**32.** Tensen, "The Allocation of Percolating Water Under the Oklahoma Ground Water Law of 1972", 14 Tulsa L.J. 437 (1972).

**33.** See Appendix C for Corps of Engineer Lake Data, "Normal Pool Storage (acre-feet)."

by pumping surface water into the aquifer.[34] While other states implement programs to conserve, protect from pollution, and guard with zeal the diminishing fresh water supplies, Oklahoma has initiated a program which by its very nature encourages complete consumption of its fresh groundwater within a twenty year span. Connecticut, North Carolina, New York, Wyoming, New Jersey, Florida, New Mexico, Nebraska, and Texas have established water quality goals for fresh water aquifers within their borders. As in Oklahoma, the portion of the Ogallala aquifer underlying Texas is being drained of water faster than it is being replaced. To combat this problem, Texas has developed a technique using satellite (landsat) imagery to allow precise estimates to be made of use and depletion of the water table.[35] Relatively, we are doing nothing.

When alternative methods can be used or developed for enhanced recovery of hydrocarbons, it is not a reasonable exercise of reasonable intelligence and reasonable diligence to sanction a process which causes a loss of unestimated billions of gallons of fresh groundwater, while we search for some means to recharge the Ogallala's source.[36] The Dust Bowl was not a mirage.

## IV

## THE ISSUE OF WASTE WAS NOT CONSIDERED PROPERLY BY THE BOARD AND THE USE OF FRESH GROUNDWATER FOR ENHANCED OIL RECOVERY MAY MEET THE BENEFICIAL USE TEST WHILE CONSTITUTING WASTE BY POLLUTION AND BY DEPLETION OF THE AQUIFER

The Legislative policy requires that any beneficial use of groundwater be reasonable.[37] The Board must determine whether the use to which an applicant intends to put the water is a reasonable and beneficial use. If it is, and if the Board finds that waste will not occur, the Board must approve the application by issuing the permit. Prior to the issuance of a permit whether—regular, temporary or special—the Board must make a finding that: the proposed use (1) is beneficial, as required by § 1020.-9;[38] (2) the beneficial use is a reasonable

34. *The Sunday Oklahoman,* "Experts Study Ways To Assure Future Resources for Ogallala Aquifer", January 23, 1984. Unfortunately, a comprehensive water program was defeated in the closing hours of the last Congressional session. Currently, only one cent of every federal dollar is spend on natural resources and environmental purposes. One-third of this goes to water projects, and this amount is going down. The *Journal Record,* "States' Cities Face Larger Fiscal Share for Water Projects, December 13, 1984. Apparently, total reliance on federal action is misplaced."

35. *State Government News* (July, 1984); *Dallas Morning News,* "A Water Survey." Aug. 19, 1984; *The New York Times* "Some Texans Need Water More Than Oil," Nov. 25, 1984.

36. On August 10, 1984, the United States Senate passed legislation to provide $20.5 million for study and construction of groundwater "recharge" projects in Western states (the projects include Oklahoma and the Ogallala Aquifer). In Texas, alone, 4 million to 6 million acre-feet of water are withdrawn while the aquifer is recharged at a rate of only 200,000 acre-feet per year. Groundwater depletion directly reflects upon the ability of farmers to earn a living and

in some cases the survival of rural towns and communities are dependent upon groundwater. Saturday *Oklahoman and Times,* "Sinking Groundwater Supplies Get Senate Boost", August 11, 1984. In Texas, the Ogallala groundwater is pumped and used at a rate of 20 to 30 times its recharge.

37. This policy is found at 82 O.S.1981 § 1020.2, see note 26, supra.

38. The requirement is provided in 82 O.S.1981 § 1020.9:

"At the hearing, the Board shall determine from the evidence presented by the parties interested, from the hydrologic surveys and from other relevant data available to the Board and applicant, whether the lands owned or leased by the applicant overlie the fresh groundwater basin or subbasin and whether the use to which the applicant intends to put the water is a beneficial use. If so, and if the Board finds that waste will not occur, the Board shall approve the application by issuing a regular permit. A regular permit shall allocate to the applicant his proportionate part of the maximum annual yield of the basin or subbasin. His proportionate part shall be that percentage of the total annual

use; and (3), waste will not occur. The trial court did not address directly the issue of waste, nor did the Board.

Assuming, *arguendo*, that flooding strata containing hydrocarbons with fresh groundwater to enhance recovery is beneficial, the use of the water for that purpose may be waste *per se* under the Board's definition of waste when it is construed in conjunction with the statutory definition of pollution. The Board defines waste as any act permitting or causing the pollution of fresh water, or the use of such water in an inefficient manner of any means which is not beneficial [39]—and the Board definition *incorporates the definitions contained in 82 O.S.1981 § 1020.15.* Pollution, in this instance, means contamination or other alteration of the physical, chemical or biological proportions of any natural waters of the state which will, or is likely to create a nuisance, or to render such waters harmful, detrimental or injurious to public health, safety, or welfare, or to threaten domestic, commercial, industrial, agricultural, recreational or other legitimate beneficial uses or to livestock, wild animals, birds, fish or other aquatic life.[40]

On appeal, the Board took the position that "the concepts of beneficial and non-wasteful use relate solely to the nature, type, or purposes of the use." The Board completely ignored its own definition of waste by pollution. The recovery process proposed by Mobil is one where detergent additives and polymers are mixed with fresh water to reduce surface tension, allowing the production of oil residue from primary recovery. The specific chemical additives were neither identified, nor was evidence presented as to whether they were harmful, or whether the contaminated water could later be reclaimed and placed back into the water cycle. Neither the Board nor the trial court were presented with any evidence that the chemicals added for enhanced recovery would not contaminate, alter the chemical or biological structure of the water, or render it harmful, detrimental, or injurious to the environment or to the public health, safety or welfare. The order sustaining the application for the temporary permit is not based upon any reasonably competent evidence that waste by pollution will not occur.[41]

yield of the basin or subbasin, previously determined to be the maximum annual yield as provided in Section 5, which is equal to the percentage of the land overlying the fresh groundwater basin or subbasin which he owns or leases. The permit shall specify the location of the permitted well or wells. A regular permit shall not be granted for less than the remaining life of the basin or subbasin as previously determined by the Board."

**39.** Waste is defined in Revised Rules and Regulations § 125.1(yyy) (April 12, 1979):

"Waste or Waste of Water means any act permitting or causing the pollution of fresh water or the use of such water in an inefficient manner or any manner that is not beneficial and is further defined in 82 O.S.Supp. 1972, § 1020.15."

**40.** Pollution is defined by 82 O.S.1981 § 926.1:

" 'Pollution' means contamination or other alteration of the physical, chemical or biological properties of any natural waters of the state, or such discharge of any liquid, gaseous, or solid substance into any waters of the state as will or is likely to create a nuisance or render such waters harmful or detrimental or injurious to public health, safety, or welfare,

or to domestic, commercial, industrial, agricultural, recreational or other legitimate beneficial uses, or to livestock, wild animals, birds, fish or other aquatic life."

**41.** It was reported in *The Sunday Oklahoman,* "Don't Drink the Water; Brine Pollution Blamed on Oil Wells", July 29, 1984, that unpublished (at time of press) U.S. Geological Survey Study reveals pollution of the Vamoos-Ada aquifer by brine water and a possible source of the pollution may be improperly constructed or maintained oil and gas wells.

Farmers in Jackson, Greer and Harmon counties have expressed concern of loss of water for irrigation purposes when drillers drill through approximately 100 feet of impervious rock which separates the Blaine Dog Creek aquifer (suitable for irrigation) from the Flower Pot formation (unsuitable for irrigation) which allows water from the Flower Pot formation to pollute the water of the Blaine Dog Creek aquifer. *The Daily Oklahoman,* "Farmers Face Losing Irrigation Water to Drilling" July 3, 1984. Several tests were made in Sasakwa, Oklahoma and excessive salt water was found in the groundwater. Studies show that there is little doubt that this pollution is the result of past oilfield operations in the area. *The Oklahoma*

Waste by pollution is not the only type of waste which the water laws mandate the Board to prevent. The Board must also safeguard groundwater against waste by depletion. Evidence was presented by Mobil to the Board and trial court indicating that it would mine and extract from the Ogallala 51,211 acre-feet of water over a twenty-year period, that more than 16 billion gallons of water would be contaminated with chemicals, placed into a structure containing hydrocarbons and removed from the water cycle. The waste of water by depletion prevents, or at a minimum drastically reduces the recharge rate of the aquifer. This loss of water may be waste *per se* under § 1020.15(3) which provides, "The Board shall not permit any fresh groundwater user to commit waste by ... taking or using fresh groundwater in any manner so that the water is lost for beneficial use."

## V

## USE OF FRESH GROUNDWATER FOR ENHANCED RECOVERY OF OIL AND GAS IS UNREASONABLE UNDER THE BOARD'S RULES

Rule 820.1 of the Water Resources Board Rules, Regulations and Modes of Procedure is designed to determine whether use of fresh water for secondary recovery of oil is reasonable under the circumstances. This rule requires that the applicant, in addition to other requirements, submit to

the Board an economic study.[42] To meet this requirement, Mobil presented evidence of comparative economic benefits of fresh water for other purposes measured against the overall value of the oil recovered. The comparison was made between the value of certain agricultural crops and enhanced oil recovery. Although Mobil contended that salt water flooding was economically unattractive, salt water flooding is only one alternative to the use of fresh groundwater.[43] Commercially feasible desalinization plants are being developed to provide suitable water for irrigation of the San Joaquin Valley in California by 1990. If this kind of water can be used for growing crops, it surely can be used to recover oil.

At a recent general session of the Society of Petroleum Engineers/Department of Energy, Enhanced Oil Recovery Symposium, political and technological effects upon enhanced oil recovery programs were discussed. Special tax exemptions have been provided to the oil industry for oil recovered through tertiary programs, a positive factor which encourages tertiary recovery. The oil recovered in the primary, secondary, and tertiary mining process has been in place for eons, and it will remain trapped in the strata while alternatives to fresh water flooding are further developed. Low cost polymer flooding (mixing fresh water with polymer chemicals) is attractive to the oil industry purely upon a cost basis. Thermal recovery programs appear to be in use and are very successful; other alterna-

*Observer*, "Tainted Water, Oil & Government", August 10, 1984.

**42.** According to Rule 820.1 the economic study must contain:
"(1) A detailed analysis of the relative cost of obtaining salt water versus the relative cost of obtaining fresh water,
(2) Total project costs and the amount of oil or gas expected to be recovered and the value expected to be realized,
(3) The estimated value of fresh water for other purposes [purposes or uses common to the area or vicinity subject of the application] as measured against the overall estimated value of the oil or gas to be recovered,
(4) The additional expense per barrel recovered if the applicant is required to use or treat salt water instead of fresh water in the recovery process, and

(5) A summary evaluation of other recovery methods or alternatives considered and why recovery requiring the use of fresh water was deemed to be necessary or the most feasible ...."

**43.** See Dace, "Oil and Gas: Water and Water Courses: The Right to Use Fresh Groundwater in Waterflood Operations", 35 Okla.L.Rev. 158 (1982), which states:
"Another possible problem with the application process is the nature of the evidence itself. Most of the evidence required to be submitted with the application involves a purely economic analysis of data. Although the use of fresh water in a secondary recovery project may produce more profits than the same water will produce if used for irrigation or for sustaining life, the value of water cannot be measured in monetary terms alone.

tives include $CO^2$ and chemical flooding.[44] While viable alternatives to fresh water flooding exist for enhanced oil recovery, there exists *no* viable usable alternative to fresh groundwater. If the cost factor of fresh water flooding increases sharply, advances in alternatives will be implemented rapidly for enhanced recovery. The cost of fresh water for flooding may be increased when those who own fresh water rights learn of its true value.[45]

The irrigation of land for growing food and fiber is a beneficial use specifically mentioned by the Legislature in its declaration of public policy to utilize groundwater resources. However, before a temporary permit for a non-domestic use can be issued, the applicant must show what method of irrigation is intended; that the method is the best available; and that waste will not result.[46] Until recently, the greatest non-domestic use of fresh water from the Ogallala aquifer has been for irrigation. In some areas, this demand alone has dropped the water table 100 feet in the last forty years. With the new burden of enhanced recovery of oil being placed upon the aquifer, no one can predict a twenty-year life-span for the Ogallala, or any other fresh groundwater basin or subbasin. The alarming facts are: one flood project by one company will use 16 billion gallons of fresh water; Mobil is not the only oil producer to use, or to desire to use the water; nor is the field to be flooded Mobil's only oil field or the only oil field which will be developed; nor is Oklahoma the only oil producing state that overlies the aquifer.

In *Texas County Irrigation v. Cities Service Oil Co.*, 570 P.2d 49 (Okla.1977) this Court stamped its imprimatur on the use of fresh groundwater in secondary oil recovery. Because this Court determined that the use of fresh groundwater in secondary flooding operations was not waste *per se*, Mobil is seeking to extend the holding to include tertiary recovery operations. I disagree with the extension of the *Texas County* doctrine for two reasons: 1) At the time the opinion was promulgated the Board had not complied with the Administrative Procedures Act and all permits were invalid; and 2) the issuance of the permit may constitute waste by depletion and by pollution.[47]

**44.** *Tulsa World,* "Enhanced Oil Recovery Methods in Infant Stages, Oil Group Told", April 17, 1984.

**45.** Adam Smith in *The Wealth of Nations* asked "How is it that water, which is so very useful that life is impossible without it, has such a low price—while diamonds, which are quite unnecessary have such a high price?" Modern economists answer by using the microeconomic concept of utility, the theory that explains value according to the degree to which the thing valued contributes to man's most urgent necessities. The total relative marginal utility and cost of the last little bit of water determine its price. Since we have an abundant supply of water today, the price is low. As water becomes scarce, its price will rise dramatically. See P. Samuelson, *Economics: An Introductory Analysis,* p. 424 (McGraw-Hill, 7th ed., 1967).
Diminishing supplies of fresh groundwater pose a severe threat to Oklahoma's future growth. A projected water shortage in Central Oklahoma may reduce industrial output by $293 million by 1990, in 1977 constant dollars, reduce personal income by $79.7 million and net governmental receipts by $21.2 million. The reductions will accelerate rapidly and are projected to result in loss of $2,508 million in industry output, $771 million in personal income, and $205.2 million in government receipts by the year 2040. *The Oklahoma Digest* "Oklahoma's Fast Depleting Water Reserves", August 27, 1984.

**46.** It has been suggested that "[t]he flexibility of the concept of beneficial use ... does not permit a court to declare that a particular use is not a beneficial use because of the circumstances if the use is one specified in the statutory declaration of policy. Thus, it would be inappropriate for the Oklahoma Water Resources Board to deny a permit for irrigation purposes in an area which is short of water on the grounds that insufficient water made irrigation a non-beneficial use. On the other hand, it might not be inappropriate for the Board to deny a permit for irrigation on those grounds if the method of irrigation proposed was wasteful." Jensen, "The Allocation of Percolating Water Under the Oklahoma Ground Water Law of 1972", 14 Tulsa L.J. 437, 472–73 (1979).

**47.** During Oklahoma's 38th Legislature (1981–82) Senate Bill 288 and House Bill 1332 were introduced. Each bill was designed to amend 82 O.S.1981 § 1020.15. The section defines waste of fresh groundwater to include "the injection or discharge of fresh groundwater into a geologic formation where it will be lost for reuse or resulting in contamination by petrole-

The dissenters conclude that no affirmative relief can be granted to the Association because it did not cross-appeal. I disagree.[48] If questions of a general public nature are involved,[49] the people of the state become indirect parties, and their interests must be protected to prevent a possible "practical injustice"—even if those who might have objected are silent.[50] The urgency of the problem demands our immediate attention. Any further delay will only beg the question, and compound the damage to our most precious natural resource.

um hydrocarbons or alteration of the physical, chemical or biological properties of such water by gaseous substances encountered in such formation." Each bill failed to pass.

**48.** Generally, errors which affect a party who does not appeal will not be reviewed; however, in the exercise of its discretion the Supreme Court may in a proper case consider cross-assignments of error even if there is no cross-appeal. This is especially so if the issue involves issues of compelling public interest.[1] To demonstrate that the appellant is not entitled to the relief sought[2] the appellee may be permitted to present and urge exceptions taken below for the purpose of sustaining the judgment. The absence of a cross-appeal does not preclude the appellee from urging any sound reason for affirmance even though the reason is not the same one assigned by the trial court for the decision.[3] Although the appellee failed to cross-appeal, the record and briefs are sufficient to present its arguments and contentions. The issues in an administrative proceeding are formed by the evidence.[4] The successful party may, without cross-appealing or assigning error, preserve the judgment by showing that errors were committed which, if corrected, would result in sustaining the trial court's disposition.[5] Evidence, introduced at the trial level to which no objection is offered, and which would be inadmissible as being not within the framework of the pleadings, may be considered on appeal. The pleadings may then be amended to conform to the proof.[6]

[1] See *Erie R. Co. v. Tompkins,* 304 U.S. 64, 82, 58 S.Ct. 817, 824, 82 L.Ed. 1188, 114 A.L.R. 1487, 1495 (1938). *Alamo Irrigation v. United States,* 81 Nev. 390, 404 P.2d 5, 7 (1965).

[2] *Peterson v. City of Norwalk,* 150 Conn. 366, 190 A.2d 33, 41 (1963).

[3] *Gourley v. Northwestern Nat'l Life Insur. Co.,* 94 Okl. 46, 220 P. 645, 647 (1923); *Gilchrist v. Lowry* 195 Okl. 537, 159 P.2d 261, 263 (1945).

[4] See note 4, Majority opinion.

[5] *Woolfolk v. Semrod,* 351 P.2d 742, 745 (Okla. 1960).

[6] *Rosser-Moon Furniture Co. v. Harris,* 191 Okla. 607, 131 P.2d 1004, 1006–1007, (1942); *L.C. Jones Trucking Company v. Jenkins,* 313 P.2d 530, 533 (Okla.1957).

**49.** The philosophy of *public juris* was recognized and utilized in *State ex rel. Poulos v. State Board of Equalization,* 552 P.2d 1134, 1137 (Okla. 1975). The Court said:

"The matter presented is *public juris,* and of immediate concern to all taxpayers. It is apparent from the exhibits presented before this Court that the assessments made by the Board do not meet the constitutional and statutory requirements as to equalization. Any further delay will only compound the failures of the past. Under such circumstances, this Court will not be saddled by the usual statutory procedures of administrative remedies. The exigency of time demands our immediate action. In awarding or delaying writs of mandamus, courts exercise judicial discretion and are governed by what seems unnecessary and proper to be done under the facts of each case for the attainment of justice."

**50.** *Murdock v. Ward,* 178 U.S. 139, 149, 20 S.Ct. 775, 779, 44 L.Ed. 1009, 1013 (1899); *In Re Initiative Petition No. 315, Etc.,* 649 P.2d 545, 553 (Okla.1982); *Lipscomb v. State Ind. Comm.,* 199 Okl. 597, 188 P.2d 841, 842 (1948); *In Re Initiative Petition No. 10 of Oklahoma City,* 186 Okl. 497, 98 P.2d 896, 897 (1940); *Magnolia Petroleum Co. v. State,* 175 Okl. 11, 52 P.2d 81, 83 (1935); *Massachusetts Nat. Bank v. Shinn,* 163 N.Y. 360, 57 N.E. 611, 612 (1900).

# APPENDIX A

**WATER USE REPORT**
For Calendar Year

OWRB CODE NO. WATER DIVISION

## ORIGINAL - RETURN TO O.W.R.B.

Please indicate any changes in name, address or ownership.

I. WATER USE

This WATER USE REPORT applies to the following _____ water rights or permits currently on file with the Oklahoma Water Resources Board. In the space provided, please indicate the amount of water use in gallons during the calendar year under each permit.

| PERMIT NO. | CNTY CODE | STREAM SYSTEM | AMOUNT | PERMIT NO. | CNTY CODE | STREAM SYSTEM | AMOUNT |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

Please complete the following table if water was used or withdrawn for this location. Indicate the TOTAL quantity (gallons) of water purchased from others and the amount that was self-supplied Self-supplied water is the total quantity produced from wells/diversion points owned, operated or leased including any water sold to others.

| MONTH | SELF-SUP. | PURCHASED | MONTH | SELF-SUP. | PURCHASED |
|---|---|---|---|---|---|
| JAN | | | JUL | | |
| FEB | | | AUG | | |
| MAR | | | SEP | | |
| APR | | | OCT | | |
| MAY | | | NOV | | |
| JUN | | | DEC | | |

Total _____ water intake for the calendar year: Self-supplied _____ (gallons)

Purchased _____ (gallons)

If purchased, from whom? _____

Was purchased water raw ____ or treated ____? If both, % raw ____.

How did you arrive at the figures which you provided above?

Master meter _____ Customer meters _____ Estimated _____ Other _____

**IMPORTANT — TO FINISH REPORT, REVERSE CARBON AND COMPLETE BACK SIDE**

## II. WATER SALES

Please list the names of water purchasers, their location (county) and the quantities of water you sold to them during the calendar year for:

1. All purchasers of 10 million gallons or more, and
2. All public water suppliers regardless of quantity.

Please indicate treated or raw fresh water.

| Name of Purchaser | Location (County) | QUANTITY SOLD (GALLONS) |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

Please attach additional sheets if necessary.

Did you include the above quantities in the amounts you indicated in question I? yes_____ no_____

## III. WATER SUPPLIERS

A. Population served by the system: _____

B. Number of service connections served directly by you: _____

master: _____

Number of service connections that are residential: _____

commercial: _____

industrial: _____

C. Please provide the TOTAL amount of water delivered for each of the following water uses:

IRRIGATION_____ AGRICULTURE _____
 (NON IRRIGATED)
PUBLIC WATER SUPPLY_____ INDUSTRY _____

RECREATION, FISH & WILDLIFE _____ POWER GENERATION_____

MINING_____ COMMERCIAL_____

OTHER (SPECIFY) _____

D. Please provide a water rate schedule in the space below, or attach a preprinted schedule if available.

### WATER RATE SCHEDULE

E. Were you forced to limit water use of your customers at any time during the calendar year?

Yes_____ No_____. If "yes" please explain:_____

_____

## IV. REMARKS

In the space provided below, please make any additional comments you feel will be of assistance to us in understanding your present and future water needs and water problems

By: _____
 Name Title Phone Date

# APPENDIX B

KEEP THIS COPY

**OKLAHOMA WATER RESOURCES BOARD**
## WATER USE REPORT
FOR CALENDAR YEAR

APPLICATION NUMBER COUNTY

Check here
if no water was used

LEGAL DESCRIPTION(S)

| CODE | CROP | NO. ACRES IRRIG. | NO TIMES IRRIG. | INCHES PER APPLIC |
|------|------|------------------|-----------------|-------------------|
| 1 | ALFALFA | | | |
| 2 | CORN (GRAIN) | | | |
| 3 | CORN (SILAGE) | | | |
| 4 | COTTON | | | |
| 5 | HORTICULTURE CROPS | | | |
| 6 | PASTURE | | | |
| 7 | PEANUTS | | | |
| 8 | WHEAT | | | |
| 9 | OTHER SMALL GRAINS | | | |
| 10 | SOYBEANS | | | |
| 11 | SORGHUM (GRAIN) | | | |
| 12 | SORGHUM (FORAGE) | | | |
| 13 | OTHER CROPS SPECIFY) | | | |

**WATER USE FOR OTHER THAN IRRIGATION**

| USE | AMOUNT (IN GALLONS) | SPECIFY |
|-----|---------------------|---------|
| | | |
| | | |
| | | |

**TYPE OF POWER**

1. PROPANE
2. ELECTRIC
3. NATURAL GAS
4. GASOLINE
5. DIESEL

**TYPE OF SYSTEM:**

1. GRAVITY
2. TRICKLE - DRIP
3. CENTER PIVOT SPRINKLER
4. SPRINKLER (OTHER THAN C-P)

SIGNATURE & TITLE DATE

**COMPLETE AND RETURN WITHIN 30 DAYS**

PLEASE INDICATE ANY CHANGES IN NAME, ADDRESS OR
OWNERSHIP

**(SEE INSTRUCTIONS ON REVERSE SIDE)**

APPENDIX C

# TULSA DISTRICT LAKE DATA

| CORPS OF ENGINEERS PROJECTS | Date Operational | Project Land & Water (Acres) | Shoreline (Miles) | NORMAL POOL | | | Flood Control Storage (Acre-Feet) | Total Storage (Acre-Feet) | Land Available for Fish & Wildlife Management (Acres) |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Surface Acres | Elevation (Mean Sea Level) | Storage (Acre-Feet) | | | |
| **OKLAHOMA** | | | | | | | | | |
| Alcoka* | -- | 5,078 | 26 | 1,820 | 1006 | 27,600 | 64,400 | 92,000 | 1,353 |
| Birch | 1977 | 3,278 | 14 | 1,140 | 750.5 | 19,200 | 39,000 | 58,200 | 1,195 |
| Boswell** | -- | -- | 40 | 5,540 | 435 | 35,800 | 1,094,200 | 1,130,000 | -- |
| Broken Bow | 1968 | 28,113 | 180 | 14,200 | 599.5 | 918,100 | 450,200 | 1,368,300 | 10,375 |
| Candy* | -- | -- | 23 | 2,170 | 720 | 44,200 | 31,300 | 75,500 | 3,165 |
| Cedar | 1948 | 19,795 | 40 | 7,910 | 1615.4 | 111,300 | 265,900 | 377,100 | 11,760 |
| Chouteau (L&D 17) | 1970 | 7,151 | 65 | 2,270 | 511 | Run of River | (none) | Run-of-River | 4,664 |
| Copan | 1983 | 13,305 | 30 | 4,850 | 710 | 43,400 | 184,300 | 227,700 | 8,607 |
| Eufaula | 1964 | 153,387 | 600 | 102,500 | 585 | 2,329,700 | 1,468,600 | 3,798,300 | 56,401 |
| Fort Gibson | 1952 | 72,447 | 225 | 19,000 | 554 | 365,200 | 919,200 | 1,284,400 | 44,654 |
| Fort Supply | 1942 | 8,079 | 26 | 1,820 | 2004 | 13,900 | 86,800 | 100,700 | 5,841 |
| Great Salt Plains | 1941 | 32,266 | 41 | 8,690 | 1125 | 31,400 | 240,000 | 271,400 | 23,459 |
| Heyburn | 1950 | 7,315 | 40 | 920 | 761.5 | 6,600 | 48,400 | 55,000 | 6,021 |
| Hugo | 1974 | 38,536 | 110 | 13,250 | 404.5 | 157,600 | 809,100 | 966,700 | 24,206 |
| Hulah | 1951 | 20,676 | 62 | 3,570 | 733 | 31,100 | 257,900 | 289,000 | 13,968 |
| Kaw | 1976 | 49,623 | 168 | 17,040 | 1010 | 428,600 | 919,400 | 1,348,000 | 28,002 |
| Keystone | 1964 | 49,264 | 330 | 23,610 | 723 | 557,600 | 1,180,000 | 1,737,600 | 21,377 |
| LuKfata** | -- | -- | 44 | 1,680 | 600 | 43,500 | 209,600 | 252,100 | -- |
| Newt Graham (L&D 18) | 1970 | 3,875 | 77 | 1,490 | 532 | Run of River | (none) | Run of River | 3,150 |
| Oologah | 1963 | 50,150 | 209 | 29,460 | 638 | 553,400 | 965,600 | 1,519,000 | 18,160 |
| Optima | 1978 | 13,249 | 38 | 5,340 | 2763.5 | 129,090 | 100,500 | 229,500 | 7,909 |
| Pine Creek | 1969 | 26,179 | 74 | 3,750 | 438 | 53,600 | 412,000 | 465,600 | 20,955 |
| Robert S Kerr (L&D 15) | 1970 | 56,708 | 250 | 42,000 | 460 | 525,700 | (none) | 525,700 | 21,377 |
| Sand* | -- | -- | 53 | 1,940 | 766.5 | 39,300 | 51,700 | 91,000 | -- |
| Sardis | 1982 | 20,659 | 117 | 14,360 | 599 | 301,400 | 128,200 | 429,600 | 8,444 |
| Shidler* | -- | -- | 35 | 2,450 | 1114.5 | 58,200 | 49,900 | 108,100 | -- |
| Skiatook* | -- | 17,857 | 160 | 10,190 | 714 | 322,700 | 178,000 | 500,700 | 7,120 |
| Tenkiller Ferry | 1952 | 30,507 | 130 | 12,900 | 632 | 654,100 | 578,700 | 1,230,800 | 13,607 |
| Texoma (Denison) | 1944 | 193,513 | 580 | 88,750 | 617.25 | 2,665,400 | 2,646,900 | 5,312,300 | 97,100 |
| Tuskahoma** | -- | -- | 72 | 11,600 | 639.5 | 235,400 | 138,600 | 374,000 | -- |
| W D Mayo (L&D 14) | 1970 | 1,321 | 50 | 1,600 | 413 | Run of River | (none) | Run-of-River | 322 |
| Wauriko | 1977 | 21,055 | 80 | 10,100 | 951.4 | 203,100 | 140,400 | 343,500 | 7,541 |
| Webbers Falls (L&D 16) | 1970 | 15,935 | 157 | 10,900 | 490 | 170,100 | (none) | 170,100 | 9,956 |
| Wister | 1949 | 39,170 | 115 | 5,400 | 474.6 | 46,100 | 386,800 | 427,900 | 33,710 |
| **KANSAS** | | | | | | | | | |
| Cedar Point** | -- | -- | 65 | 4,330 | 1324.6 | 122,600 | 57,200 | 179,800 | -- |
| Council Grove | 1964 | 5,975 | 40 | 3,230 | 1274 | 48,500 | 63,800 | 112,300 | 2,549 |
| Douglass** | -- | -- | 43 | 5,170 | 1258 | 95,500 | 76,400 | 171,900 | -- |
| El Dorado | 1981 | 13,414 | 98 | 8,000 | 1339 | 157,000 | 79,200 | 236,200 | 2,843 |
| Fall City | 1966 | 18,469 | 50 | 4,450 | 796 | 44,800 | 239,500 | 284,300 | 13,358 |
| Fall River | 1949 | 15,147 | 40 | 2,350 | 948.5 | 21,900 | 211,500 | 256,400 | 10,797 |
| John Redmond | 1964 | 29,798 | 59 | 9,280 | 1039 | 71,300 | 559,000 | 630,300 | 20,056 |
| Marion | 1968 | 12,249 | 60 | 6,200 | 1350.5 | 83,700 | 60,200 | 143,900 | 4,369 |
| Pearson Skubitz Big Hill | 1981 | 2,572 | 20 | 1,240 | 858 | 27,500 | 13,100 | 40,600 | 561 |
| Toronto | 1960 | 8,623 | 51 | 2,660 | 901.5 | 21,000 | 179,800 | 200,800 | 5,006 |
| Towanda** | -- | -- | 75 | 6,200 | 1285 | 74,500 | 133,500 | 208,000 | -- |
| **TEXAS** | | | | | | | | | |
| Pat Mayse | 1967 | 19,260 | 67 | 5,990 | 451 | 124,500 | 64,600 | 189,100 | 12,855 |
| | -- | -- | | | | | 74,500 | 174,400 | -- |

HARGRAVE, Justice, concurring in part and dissenting in part:

I concur with the majority only insofar as the opinion reverses the District Court's ruling that ground water may not be used off of the land from which it is taken. Despite appearances, transportation of ground water is the single issue properly before this Court on appeal. Appellants' petition in error contains eleven assignments of error, and their brief argues four of those assignments. Conspicuously absent is any mention of waste, and the absence of that issue was noted by the Water Resources Board in a brief filed in response to this Court's sua sponte enlargement of the issues.

The water transport issue was appealed in a timely fashion—the remaining issues were unappealed and are now final and unappealable. Addressing other issues is a departure from acceptable appellate practice and is an unwarranted exercise of judicial power.

I am authorized to state that LAVENDER, J., joins in the views expressed herein.